## AMERICAN HOSPITAL ASSOCIATION, Plaintiff,

v.

**NATIONAL LABOR RELATIONS BOARD, James M. Stephens, Mary M. Cracraft, John E. Higgins, Jr., Dennis M. Devaney, and John C. Truesdale, Defendants,**

**and**

**American Federation of Labor and Congress of Industrial Organizations, the Building and Construction Trades Department, and American Nurses' Association, Permissive Intervenors Pursuant to Fed.R.Civ.P. 24(b).**

### No. 89 C 3279.

United States District Court,
N.D. Illinois, E.D.

July 25, 1989.

Laurence H. Lenz, Jr., Brian Bulger, Daniel Kaufman, and Michael W. Duffee, Katten Muchin & Zavis, Chicago, Ill., and Benjamin Civiletti, Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

Eric G. Moskowitz, Diane Rosse, Norton J. Come, Deputy Associate Gen. Counsel, Linda R. Sher, Asst. Gen. Counsel, N.L.R.B., Washington, D.C., and William G. Kocol, N.L.R.B., Region 13, Chicago, Ill., for defendants.

George Kaufman and Woody N. Peterson, Dickstein, Shapiro & Morin, Washington, D.C., Peggy Hillman, Chicago, Ill., for intervenor, American Nurses' Ass'n.

Joel A. D'Alba and Marvin Gittler, Asher, Pavalon, Gittler and Greenfield, Chicago, Ill., for intervenor, AFL–CIO.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

The American Hospital Association (the "AHA") seeks to permanently enjoin the National Labor Relations Board (the "NLRB" or the "Board") from enforcing a newly promulgated rule, 29 C.F.R. Part 103, pertaining to bargaining units in the health care industry (the "Rule").[1] The Rule was promulgated pursuant to the Board's rule-making authority under section 6 of the National Labor Relations Act (the "NLRA" or the "Act"), 29 U.S.C. sec. 156 (1988), and the procedures set forth in section 553 of the Administrative Procedure Act (the "APA"), 5 U.S.C. sec. 553 (1988). If given effect, the Rule will establish eight units for the purposes of collective bargaining in acute care hospitals. Prior to this Rule the Board's policy was to determine the appropriateness of bargaining units in individual cases. The AHA asks us to declare this Rule invalid on three alternative grounds: 1) the Rule contravenes section 9(b) of the Act, 29 U.S.C. sec. 159(b) (1988), which provides that bargaining unit determinations must be made "in each case", 2) the Rule contravenes the 1974 Health Care Amendments which mandate that the Board avoid undue proliferation of bargaining units in the health care industry and 3) the Rule is arbitrary and capricious and is not supported by substantial evidence. The NLRB has filed a motion for summary judgment.[2]

[1.] On April 21, 1989, AHA filed a complaint in this court seeking an injunction enjoining enforcement of the Board's Rule and a judgment that the Rule is invalid. On May 22, 1989, this court issued a preliminary injunction and ordered an expedited briefing schedule.

[2.] The Board asked this court to dismiss the AHA's complaint for lack of jurisdiction. The Board argued that the district court has no jurisdiction over a representation decision; section 9(d), 29 U.S.C. sec. 159(d), provides a specific mechanism for such review and any judicial review must take place in the court of appeals. We denied the Board's request for dismissal (oral ruling, May 19, 1989) because plaintiff does not ask us to determine the validity of representation under the new Rule, but questions the Board's authority to promulgate the rule. We are not foreclosed from review of the Board's rule-making authority. *American Medical Ass'n v. Weinberger*, 395 F.Supp. 515 (N.D.Ill.), *aff'd*, 522 F.2d 921 (7th Cir.1975).

## I. BACKGROUND

### A. *Legislative Enactments*

The Wagner Act (National Labor Relations Act of 1935, 29 U.S.C. secs. 151, *et seq.* (1935)), was enacted to promote unionization and collective bargaining. After a time, Congress found that the Wagner Act unduly favored unions over companies and Congress passed the Taft–Hartley Act, amending the Wagner Act and creating a more balanced statutory scheme, while continuing the right of employees to be free from employer coercion. *See* C. Morris, *The Developing Labor Law* 437 (2d ed. 1983).

In 1974 Congress amended the Act to cover all private health care institutions, including not-for-profit hospitals.[3] Act of July 26, 1974, Pub.L. No. 93–360, 88 Stat. 395 (hereinafter "Health Care Amendments"). At this time Congress also recognized that labor regulation in the health care industry involves distinctive considerations. Patient treatment cannot tolerate interruption because health institutions provide care to the sick, the aged and the infirm. A disturbance in health care services is more serious than a break, for example, in industrial plant production. *See St. Vincent Hospital v. NLRB,* 567 F.2d 588, 590 (3rd Cir.1977).

Ironically, the health care industry is particularly vulnerable to labor unrest. The industry is highly specialized and consists of many—frequently unrelated—professional and vocational specialties. Although only a few employees in each specialty may concentrate in a particular hospital, there is the potential for numerous job classifications and consequently the danger that collective bargaining units will proliferate. The greater the number of units, the stronger the likelihood of labor unrest, which in turn jeopardizes the functioning of health care facilities. This is because the more units there are in a particular hospital, the fewer employees that have to agree to call a strike. *See NLRB v. Res–Care, Inc.,* 705 F.2d 1461, 1469 (7th Cir. 1983). Although it may be true that the smaller the unit the less critical an impact the strike will have, this may not be true in a health care institution where frequently each group of employees plays a significant role in the patient care and where the service cannot be prepared in advance. *Id.* Thus, the pattern of bargaining units organized in health care facilities has a considerable impact on the institutions.[4]

In order to protect the health care industry Congress included in the Health Care Amendments special provisions that lengthen the strike notice period and require federal mediation. NLRA sec. 8(d)(A)–(C), (g), 29 U.S.C. sec. 158(d)(A)–(C), (g). Congress, however, neither amended section 9 of the Act, 29 U.S.C. sec. 159, the provision which controls determination of bargaining units by the Board, to reflect their concern over proliferation of bargaining units, nor accepted a proposal by Senator Taft which would have limited, by statute, the number of bargaining units to five (including guards) in non-profit health care institutions. S. 2292, 93 Cong., 1st Sess. (1973), *reprinted in, Legislative History of the*

---

**3.** Under the Wagner Act all hospitals were subject to federal regulation. The Taft–Hartley Act, however, exempted not-for-profit hospitals. In 1960, the Board included for-profit hospitals within the regulatory exemption, reasoning that hospitals were essentially local operations which did not operate in interstate commerce. *Flatbush General Hospital,* 126 NLRB 144 (1960). The Board reversed this exemption in 1967. *Butte Medical Properties,* 168 NLRB 266 (1967).

**4.** One commentator notes with respect to the vulnerability of health care institutions to labor unrest:

The numbers and types of units established can reasonably be expected to have an impact upon the incidence of labor disputes in health care institutions, and thus, upon the interruption of the delivery of services by such institutions, the costs of health care services, the administrative burden of managing health care institutions, the effectiveness of the organizational efforts of labor organizations and of their representation of employees, and the effectiveness of the collective bargaining process.

Bumpass, *Appropriate Bargaining Units in Health Care Institutions: An Analysis of Congressional Intent and Its Implementation by the National Labor Relations Board,* 20 B.C.L.Rev. 867, 868 n. 8 (1979).

*Coverage of Nonprofit Hospitals Under the National Labor Relations Act* at 457–58 (hereinafter *"Legis. Hist."*). Instead, Congress, in both the House and Senate Committee Reports, expressed its concern by admonishing the Board to give due consideration "to preventing proliferation of bargaining units in the health care industry." Congress' statement was, in its entirety:

### EFFECT ON EXISTING LAW

#### Bargaining Units

Due consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry. In this connection, the Committee notes with approval the recent Board decisions in *Four Seasons Nursing Center,* 208 NLRB No. 50, 85 LRRM 1093 (1974), and *Woodland Park Hospital,* 205 NLRB No. 144, 84 LRRM 1975 (1973), as well as the trend toward broader units enunciated in *Extendicare of West Virginia,* 203 NLRB No. 170, 83 LRRM 1242 (1973).[1]

[1] By our reference to *Extendicare,* we do not necessarily approve all of the holdings of that decision.

*Legis. Hist.,* at 12, 274–75.

### B. *Bargaining Unit Determinations*

Section 7 of the Act, 29 U.S.C. sec. 157 (1988), gives employees the right of self-organization. In the absence of an agreement between the employer and the employees, a union can obtain recognition for the purposes of collective bargaining by petitioning the Board under section 9 of the Act, and the Board must determine if employees in the petitioned-for unit form an appropriate bargaining unit.[5] Section 9(b) instructs the Board that an appropriate unit is one which will "assure to employees the fullest freedom in exercising the rights

guaranteed by ... [the] Act." The Act prevents the Board from using the "extent to which the employees have organized" as controlling in certifying election petitions. NLRA sec. 9(c)(5), 29 U.S.C. sec. 159(c)(5). The Act provides the Board with little other guidance in charging it to determine appropriate bargaining units for certification, thus the Board possesses broad discretion in this area. *Allied Chemical & Alkali Workers, Local No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 171–72, 92 S.Ct. 383, 393–94, 30 L.Ed.2d 341 (1971); *NLRB v. West Suburban Hospital,* 570 F.2d 213, 214 (7th Cir.1978). Where, as here, a statute entrusts an agency with broad discretion to make decisions, a court will usually review the agency action under the deferential "abuse of discretion" standard. *NLRB v. Res–Care,* 705 F.2d 1461. Indeed, this is the standard generally used in unit determination cases. *Id.*

Unit determination requires that the Board weigh the competing interests of the employer and the employees. Employers seek few units with a greater number of workers presumably because many small units increase the likelihood of strikes and require repetitive bargaining, resulting in increased costs. If the units are too large, however, it impinges on the employees' right to union representation because too diversified a constituency may generate conflicts of interest and dissatisfaction within the group. *Id.* Generally, the Board's unit determinations are based on a "community of interest" standard.[6] C. Morris, *supra,* at 416–17. Under this principle employees with similar interests appropriately would be placed together for the purposes of collective bargaining. *See, e.g., In re Chrysler Corp.,* 1 NLRB 164, 169–70 (1936). Given the broad discretion permitted the Board, it would seem difficult for the courts to find

---

5. Specifically, under NLRA sec. 9(b), 29 U.S.C. sec. 159(b) (1988), the Board must determine whether an "employer unit, craft unit, plant unit or subdivision thereof ..." constitutes an appropriate bargaining unit.

6. Under the "community-of-interest" standard an appropriate bargaining unit is identified by

the following characteristics: similarity of wages and hours, extent of common supervision, frequency of contact with other employees, and area practice and patterns of bargaining. *Allegheny General Hospital,* 239 NLRB 872, 873 (1978), *enf. denied on other grounds,* 608 F.2d 965 (3rd Cir.1979).

fault with the community-of-interest standard. *Res–Care,* 705 F.2d at 1469. Nonetheless, in the fifteen years since the Health Care Amendments were enacted reviewing courts have tended to be less deferential to the NLRB's authority to make unit determinations when health care employees are at issue. *E.g., Mary Thompson Hospital, Inc. v. NLRB,* 621 F.2d 858, 864 (7th Cir.1980) (because of Congressional admonition "Board must not rely exclusively on traditional community-of-interest analysis"). The court of appeals attributes their frequent rejection of the Board's orders to the Board's failure to properly consider Congress' admonition to void undue proliferation of bargaining units. *See, e.g., NLRB v. HMO Int'l/California Medical Group Health Plan, Inc.,* 678 F.2d 806, 808 (9th Cir.1982); *Beth Israel Hosp. & Geriatric Center v. NLRB,* 677 F.2d 1343, 1345 (10th Cir.1981), *cert. denied,* 459 U.S. 1025, 103 S.Ct. 433, 74 L.Ed.2d 522 (1982); *Presbyterian/St. Luke's Medical Center v. NLRB,* 653 F.2d 450, 455 (10th Cir.1981), *cert. denied,* 459 U.S. 1025, 103 S.Ct. 433, 74 L.Ed.2d 522 (1982); *NLRB v. Mercy Hosp. Ass'n,* 606 F.2d 22 (2nd Cir.1979), *cert. denied,* 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 248 (1980); *NLRB v. St. Francis Hosp.,* 601 F.2d 404 (9th Cir.1979); *NLRB v. West Suburban Hosp.,* 570 F.2d 213 (7th Cir.1978); *St. Vincent's Hosp. v. NLRB,* 567 F.2d 588 (3d Cir.1977).

In response to judicial criticism, in 1982 the Board introduced a new two-tiered approach for bargaining unit determination on health care, *St. Francis Hospital,* 265 NLRB 1025 (1982) (hereinafter *"St. Francis I"*). First, the Board would determine if the petitioned-for unit was one of the seven units identified as "potentially appropriate" (physicians, registered nurses, other professional employees, technical employees, business office clerical employees, service and maintenance employees, and skilled maintenance employees). Second, the Board determined whether a community of interest existed among the employees in the unit and if it did the unit would be approved. A unit which did not coincide with any of the seven categories would be approved only in extraordinary circumstances. *Id.* at 1029.

When the hospital refused to bargain with the prevailing union in the unit approved in *St. Francis I,* the Board reevaluated its two-tier approach in light of the judicial criticism of the community-of-interest approach. *St. Francis Hospital,* 271 NLRB 948 (1984) (hereinafter *"St. Francis II"*). The NLRB adopted a "disparity-of-interest" test which, the Board asserted, took better account of the Congressional Admonition against undue proliferation.[7] The Board expressly indicated that it adopted this approach because it avoided a rigid standard which would be inappropriate for the "diverse nature of today's health care industry", *id.* at 953 n. 39, and thus would comport "with Congress' intent that the Board be free to exercise flexibility in dealing with unit determinations on a case-by-case basis." *Id.* at 951 n. 17.

The Court of Appeals for the District of Columbia reversed *St. Francis II,* holding that while the disparity-of-interest standard was permissible under the Act, it was not a required interpretation and remanded the case to the Board for further explanation. *IBEW, Local Union 474 v. NLRB,* 814 F.2d 697, 708 (D.C.Cir.1987). The NLRB accepted remand, but rather than seeking further review or explicating its disparity-of-interest approach, the Board announced its intent to invoke its section 6 rule-making authority and finally resolve the issue of appropriate bargaining units in the health care industry. *St. Francis Hospital,* 286 NLRB No. 123 (1987). *See also St. Vincent Hospital,* 285 NLRB No. 64 (1987). This litigation is the result of the Board's decision to determine unit appropriateness by rule-making.

---

7. A unit will be approved under the disparity-of-interest test if there exists "sharper than usual differences (or disparities) between wages, hours, and working conditions, etc., of the requested employees and those in an overall professional or nonprofessional unit." *St. Francis II,* 271 NLRB at 953.

## C. *The Rule–Making*

On July 2, 1987, the Board published a Notice of Proposed Rulemaking and Hearing, explaining that it intended "to amend its rules to include a new provision specifying which bargaining units will be found appropriate in various types of health care facilities." Notice of Proposed Rulemaking, July 2, 1977, 52 Fed.Reg. 25142–49 (hereinafter "NPR I"). The Board indicated that it was abandoning its unsuccessful doctrinal approaches and would gather empirical evidence in order to make "an informed judgment as to what types of units should be found appropriate in the health care industry." NPR I, 52 Fed.Reg. 25144. In NPR I the Board proposed that in large acute care hospitals with more than 100 beds six units (registered nurses, physicians, technical employees, service and maintenance and clerical employees except guards, and guards) would be appropriate. *Id.* at 25149.[8] Following the publication of NPR I the Board gathered testimony and comments on the proposed rules.

On September 1, 1988, the Board published a Second Notice of Proposed Rulemaking (NPR II), 52 Fed.Reg. 33900–33935. In NPR II the Board abandoned the large-small hospital distinction and removed nursing homes and psychiatric hospitals from the scope of the proposed rule. NPR II, 52 Fed.Reg. 33927–30. The Board also divided the service maintenance and clerical unit into three separate units consisting of skilled maintenance workers, business office clericals and service and other non-professional employees. *Id.* at 33920–27.

On April 21, 1989, the Board published the Final Rule. 29 C.F.R. Part 103, 54 Fed.Reg. 16336–48 (the "Rule"). Under the Rule the eight bargaining units proposed in NPR II would be the only units appropriate for collective bargaining in an acute care hospital, absent extraordinary circumstances. The Rule provides for a substantial departure from the method the Board used to make unit determinations over the last fifty years. The Board indicated that it deliberately chose to make the eight units determinative of appropriateness and not presumptively appropriate "because one important advantage of rulemaking is the certainty it offers." NPR I, 52 Fed.Reg. 25145. The Board added that rules are more effective than rebuttable presumptions to resolve their concern with duplicative litigation. Final Rule, 54 Fed. Reg. 6338–39. The Board justifies its action by stating that in its experience "facilities and employee functions in hospitals and other health care institutions of approximately the same size and type are virtually identical." NPR I, Fed.Reg. 25145.

Although the Board leaves an opportunity for a hospital to remove itself from the general applicability of the rules by claiming an "extraordinary circumstance"[9], the Board has signaled its intent to construe this exception narrowly "so that it would not provide an excuse, opportunity or 'loophole' for redundant and unnecessary litigation...." NPR II, 52 Fed.Reg. 33923. Consequently, the Board enumerates several broad categories of concerns a hospital might advance to remove itself from the general applicability of the Rule which will *not* be considered. These issues, according to the Board, were addressed during the rule-making process, found not to affect a unit determination, and therefore, would not qualify for litigation under the extraordinary circumstance exception.[10] In any

---

**8.** In nursing homes and smaller hospitals the number of appropriate units would be limited to four. These were: all professional employees, all technical employees, all service, maintenance and clerical employees except guards, and all guards.

**9.** The Rule enables a facility claiming an extraordinary circumstance to present an offer of proof to a hearing officer who will either permit the evidence to be adduced or refer the offer to the Regional Director, or if requested, the Board. If it is determined that an extraordinary

circumstance does not exist, the hospital can seek judicial review.

The Board does note that an extraordinary circumstance which will remove a unit from automatic coverage by the Rule is a petition for a unit comprised of five or fewer employees. Final Rule, 54 Fed.Reg. 16346.

**10.** According to the Board the following issues have already been considered and will not be subject to further litigation with respect to unit determinations:

event, the Board concludes that the rule reflects a natural and realistic grouping found in the health care industry and once the rule is in effect "no other unit will be found appropriate by the Board absent extraordinary circumstances."[11]

The AHA believes these rules are invalid and sues for injunctive relief. The NLRB defends its new Rule and seeks summary judgment in its favor.

## II. ANALYSIS

The AHA's complaint questions the scope of the Board's rulemaking authority under section 6 of the NLRA, in light of section 9(b), and in the particular context of the health care industry. Section 9(b) provides:

> The Board shall decide *in each case* whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit or subdivision.... (Emphasis added.)

The AHA contends that the "in each case" language mandates that the Board make an individualized determination of appropriate bargaining units based on the particular facts of each case presented to the Board. The AHA says that the NLRB's new Rule pre-determines appropriate bargaining units, and thus, obviates the case-by-case review called for by 9(b). The Board, with its best argument, concedes

that perhaps 9(b) contemplates that the Board will make a unit determination in each case in which a petition for a representation election is filed. Even so, the Board argues, 9(b) does not preclude the Board from promulgating general rules and regulations applicable to unit determination, pursuant to their section 6 power.

Congress afforded the Board broad discretion under section 9 of the Act to determine appropriate employee units for the purposes of collective bargaining. *IBEW, Local No. 474*, 814 F.2d at 699. We will not, however, sustain a use of this discretion if it is based on the Board's erroneous understanding of the statute. *Id.* (quoting *Prill v. NLRB*, 755 F.2d 941, 947 (D.C.Cir.), *cert. denied*, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985). *Accord Ford Motor Co. v. NLRB*, 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979).

### A. *Judicial Review*

The starting point for any judicial interpretation of a statute must be the language of the statute itself and if "we find the terms of a statute unambiguous, judicial inquiry is complete." *In re Sinclair*, 870 F.2d 1340, 1341 (7th Cir.1989) (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)). *See also Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). This dispute rests on the meaning of the words "in each case." These words are not necessarily inconsistent with the Board's attempt to promulgate industry-

---

... arguments relating to (1) Diversity of the industry, such as the sizes of various institutions, the variety of services offered by individual institutions, including the range of out-patient services provided, and differing staffing patterns among facilities (as, for example, a particular facility employing a larger or smaller number of RNs than generally employed by similarly situated hospitals); (2) increased functional integration of, and a higher degree of work contacts between, employees as a result of the advent of the multi-competent worker, increased use of "team" care, and cross-training of employees; (3) the impact of nation-wide hospital "chains"; (4) recent changes within traditional employee groupings and professions, e.g., the increase in specialization among RNs; (5) the effects of various governmental and private cost-containment measures; and (6) single institutions

occupying more than one contiguous building. Except as specifically noted elsewhere (e.g., exclusion of psychiatric hospitals and nursing homes from coverage by the rule), the Board has concluded that none of the arguments raised in the course of the rulemaking procedure, including those listed above, alone or in combination, constitutes an "extraordinary circumstance" justifying an exception from the rule.

NPR II, 53 Fed.Reg 33932 (footnote omitted).

**11.** Board member Wilford W. Johansen dissented from the Board's decision to establish bargaining units through its rulemaking procedure. He stated that rule-making was foreclosed by section 9(b) and furthermore, in this context is "at best inadvisable." Final Rule, 54 Fed.Reg. 16347.

wide rules, unless there is some indication that Congress required fact specific determinations in each case. We cannot rely simply on the plain meaning of 9(b) to determine the limitations the statute imposes on the Board's section 6 rule-making authority. When the words of a statute are vague, so that a resolution cannot be gleaned from the words of the text, we must determine which interpretation "would best advance the legislative purpose." *Virtual Network Services v. United States*, 98 B.R. 343, 345 (N.D.Ill.1989) (quoting *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175 (7th Cir.1987)).

The NLRB suggests that because the text of the statute offers no determinative guidance, we are obligated to give deference to an agency interpretation which is based on a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). *Accord NLRB v. United Foods & Commercial Workers Union*, 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). But deference is due the agency only if its interpretation is rational and consistent with the statute. *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978). *Accord Public Employees Retirement System of Ohio v. Betts*, —— U.S. ——, ——, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989) (no deference due agency interpretation at odds with the language of the statute itself); *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) (administrative order cannot be upheld unless the grounds upon which agency acted in exercising its powers were those upon which its action can be sustained). We refuse the Board's invitation to defer to their interpretation of 9(b).[12] Although the language of the statute is not

definitive, it does shed doubt on the extent of the Board's authority.

It is not within our province to determine whether the AHA's or the NLRB's interpretation of 9(b) is best suited for the health industry. The political branches engage in a deliberate process to arrive at text which becomes law. *In re Sinclair*, 870 F.2d at 1344. We must abide by their pronouncements. Legislative history, although it is not "a source of legal rules competing with those found in the U.S. Code ..." may help "us learn what Congress meant by what it said." *Id.* So, because the words of the statute do not lend a definitive answer with respect to the scope of the NLRB's rule-making authority under 9(b) and because the NLRB's Rule may in fact be inconsistent with the "in each case" language, we must examine Congress' purpose.

### B. *Rule–Making Authority Under Section 9(b)*

The AHA and the Board agree that it is indicative of Congressional intent that the original texts of the Senate and House Bills did not contain the "in each case" language. *See* Senate Bill 1958, 74th Cong., 1st Sess., *reprinted in*, I *Legislative History of the National Labor Relations Act 1935*, at 1300 (1949) (hereinafter "—— *1935 Legis. Hist.*, at ——"); House Bill H.R. 6187 and 6288, 74th Cong., 1st Sess., *reprinted in*, II *1935 Legis. Hist.*, at 2449, 2464. Later, House Bill H.R. 7978 was introduced which included the "in each case" language, and the Senate Bill was amended to conform to the H.R. 7978. The amendment was accepted by the House–Senate Committee. *See* II *1935 Legis. Hist.*, at 3253–54. The parties do not agree, however, on the implications of Congress' addition. The AHA says the language clearly signals Congress' intent that bargaining unit deter-

---

**12.** Consideration must also be given to the consistency with which the NLRB has interpreted a statute. Prior to the Rule, for over fifty years, the Board's policy was to make bargaining unit determinations through administrative review of each petition, because, as the Board noted in *St. Francis Hospital*, 271 NLRB 948, 951 n. 17 (1984), Congress intended that it "exercise flexibility in dealing with the unit determinations on

a case-by-case basis." When, as here, an administrative agency vacillates in its interpretation of an authorizing statute, its interpretation is entitled to little deference. *NLRB v. United Food and Commercial Workers Union*, 484 U.S. 112, 108 S.Ct. at 421 n. 20; *County of Washington v. Gunther*, 452 U.S. 161, 177–78, 101 S.Ct. 2242, 2251–52, 68 L.Ed.2d 751 (1981).

minations should be made by the Board on a case-by-case basis. As support the AHA cites to the House Labor Committee Report on H.R. 7978 which explains:

Section 9(b) provides that the Board shall determine whether, in order to effectuate the policy of the bill (as expressed in sec. 1), the unit appropriate for the purposes of collective bargaining shall be the craft unit, plant unit, employer unit or other unit. *This matter is obviously one for determination in each individual case,* and the only possible workable arrangement is to authorize the impartial governmental agency, the Board, to make that determination.

H.R.Rep. No. 969, 74th Cong., 1st Sess. (1935), *reprinted in* II *1935 Legis. Hist.*, at 2930 (emphasis added).

The Board contends that the amendment was just a house-cleaning detail and refers to Labor Secretary Perkins' comment that "in each case" was only one of several small amendments "made for the sake of clarity." I *1935 Legis. Hist.*, at 1442. According to the Board the statement in the Committee Report, cited by plaintiff, followed a discussion of which entity should make unit appropriateness decisions—the employer, the union or the government agency—and that therefore, the only significance of the words "in each case" is that unit determination will be the function of the Board.

We must adopt the AHA's view of the Congressional intent for several reasons. First, the Board has failed to show that even if the amendment was small and only for the sake of clarity it is inconsistent with Congressional intent that unit determinations should be on an individual basis. In any event, Secretary Perkins' understanding of the amendment carries little weight, no significance is to be accorded statements made by nonmembers in a Congressional hearing. *See Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 361–62 n. 13, 93 L.Ed.2d 216 (1986). On the other hand, the explanation in the House Report, a persuasive indicia of Congressional intent, provides compelling support that Congress contemplated that unit determinations would require fact specific inquiries. *See Mills v. United States,* 713 F.2d 1249, 1252 (7th Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984) (generally, the committee report is "the most persuasive indicia of Congressional intent (with the exception, of course, of the language of the statute itself)").

The Board's explanation that the House Report simply emphasizes that the Board is to make the unit determination is less plausible, we do not see how the words "in each case" serve to reiterate the Board's authority. If we were to accept the Board's construction, the words "in each case" become superfluous in the context of section 9(b), merely repeating Congress' charge to the Board in the preceding phrase. We hesitate to condone such a result. *Zimmerman v. North American Signal Co.,* 704 F.2d 347, 353 (7th Cir.1983) ("[a]s a general rule, a court should not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous.").

Finally, an important and obvious rule of statutory construction is that a particular statutory phrase should not be construed in isolation but with reference to the statute as a whole. *United States v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). One purpose of the NLRA is to provide employees with the right to bargain collectively, section 9(b) states specifically that the Board's unit determination must "assure to employees the fullest freedom in exercising the rights guaranteed." It is fair to say that an individualized determination of bargaining units appropriate in a particular institution or facility will better assure employees the "fullest freedom in exercising ... [their] rights." Although the language "in each case" may not plainly indicate Congress' purpose, the fairer and more plausible interpretation is that Congress believed that for collective bargaining to fulfill the purpose for which it was meant, unit appropriateness should be considered by the Board on a case-by-case basis.

The AHA tells us that if we find that 9(b) contemplates individualized bargaining unit

determinations, we must find the Board's Rule invalid. We disagree. The AHA still falls short of victory. The fact that the NLRB is statutorily bound to make determinations which are tailored to individual cases is not necessarily inconsistent with the Board's use of its section 6 rule-making authority. It would be a misuse of resources to prevent the Board from using fact gathering apparatus to develop principles applicable to recurring scenarios. It defies common sense to believe Congress would entrust unit determination to the Board under section 9 because of its experience and expertise, and then, simultaneously require it to face each contested case *ab initio*. Indeed, there are persuasive arguments to encourage the Board to take advantage of its rule-making authority.[13] Peck, *The Atrophied Rule–Making Powers of the National Labor Relations Board*, 70 Yale L.J. 729 (1961). Of course, there are equally compelling arguments that case-by-case adjudication is more appropriate to the Board's function. Although it may be cumbersome, case-by-case review is more amenable to the unique circumstances of employers and employees in diverse settings, and perhaps, a necessary burden for a labor policy which will extend to employees the fullest freedom to exercise their rights.

■ For our purposes in this litigation, however, it is sufficient to conclude that the Board is not foreclosed from rule-making in fulfilling its 9(b) charge. A definitive decision concerning the limitations on the Board's general rule-making authority with respect to bargaining unit appropriateness can be left for another day. This case presents a far narrower issue: the extent of the Board's rule-making authority under 9(b) in the context of the health care industry. This changes the nature of the inquiry. Both the legislative and judicial branches have recognized health care as a unique and complex industry, and as discussed above, generally applicable standards frequently have been revised or even rejected when applied in the context of the health care field. *See, e.g., Mary Thompson Hospital v. NLRB*, 621 F.2d 858, 864 (7th Cir.1980).

### C. Congress' Admonition Against Undue Proliferation

The stakes are higher when the Board makes bargaining unit determinations in the health care field; fragmentation of the workforce is more likely and of greater concern when patient care is at issue. Congress drew attention to the distinctive vulnerability of health care by enacting amendments to the NLRA in 1974 and, particularly, by stating in both the Senate and House committee reports that the Board should avoid undue proliferation of bargaining units in the health care industry. Much authority has been given to this admonition and many circuits have reversed the Board for failing to give proper credence to the Congress' expressed concern. Although a number of circuit court judges have questioned how much weight the committees' statement should be given, *Res–Care*, 705 F.2d at 1470 (Posner, J.); *IBEW, Local 474*, 814 F.2d at 712 (Edwards, J.), the Seventh Circuit, and others, have treated the statement as authoritative. *See, e.g., Res–Care*, 705 F.2d at 1470;

---

**13.** One inherent advantage of using substantive rules is the consistency they provide. If the Board articulates clear labor policy through rule-making then the people will know what the law requires and the extent of their rights. Rule-making advances policy which can be applied uniformly by Board representatives, whereas case-by-case adjudication, even when rules derived by adjudication are applied, emphasizes only the facts before the Board, thus giving rise to haphazard policy and disparate treatment of parties. Bernstein, *The NLRB's Adjudication–Rule Making Dilemma Under the Administrative Procedure Act*, 79 Yale L.J. 571, 590–91 (1970) ("[r]ulemaking provides the agency with the opportunity to initiate changes in its own doctrine whereas adjudication leaves the initiative to the few private parties who have the resources, the hardheadedness, or the innocence to persevere in the litigation process"). The Board's ability to act on particular matters is limited to the controversies brought to its attention, only its rule-making authority and the procedures outlined in the APA enable the Board to gather diverse and informed opinions and gain a broader overview of the reality of the workplace. *See Morris, The NLRB in the Dog House—Can an Old Board Learn New Tricks?*, 24 San Diego L.Rev. 9 (1987).

*NLRB v. West Suburban Hospital,* 570 F.2d 213 (7th Cir.1978).

1.

■ The question of how much proliferation is undue has not been resolved in this circuit. *Res–Care,* 705 F.2d at 1470. An absolute answer to this question is not required to conclude that the Board's Rule will create undue proliferation. Suffice it to say, that it is evident that the Board has failed to give "more than mere lip service mention of the Congressional admonition", *NLRB v. West Suburban Hospital,* 570 F.2d at 216, when it promulgated its new Rule. The Rule mandates *automatic* fragmentation of the workforce into eight units, without regard to the nature and extent of the health services rendered or the dynamics of a particular health care institution.[14]

The American Federation of Labor and Congress of Industrial Organizations (AFL–CIO) and the Building and Construction Trades Department note that proliferation is but one factor that the Board must take into account when it makes unit determinations and while the rule may implicate the proliferation concern, other factors, such as section 9(b)'s directive to assure employees the fullest freedom in bargaining, must also be factored into the Board's decision. Congress only required the Board to give proliferation "due consideration" and it was not an abuse of discretion for the Board to establish the units in the Rule if they accommodated other Congressional concerns. Although a compelling argument, this is not the way we understand the policy against proliferation.

There are general directives which the Board must follow whenever it makes a unit appropriateness decision in whatever the industry. But Congress drew attention to health care by adding another concern, which must be addressed by the Board in certifying bargaining units in that industry. We understand this to mean that when the Board takes action or crafts policy with respect to bargaining units involving health care employees, it must use the means least likely to cause unit proliferation to achieve their objective. Although we can agree with the Board that the eight units they establish are appropriate and in many instances may match the natural divisions among the employees in health care institutions, we can envision other divisions, perhaps fewer divisions, in the varied health institutions which would be equally reasonable.

2.

In its defense the Board argues that the Rule is functionally no different than adjudicated rules of general applicability which the Board has relied on with judicial approval. *National Labor Relations Board v. Metropolitan Life Insurance Co.,* 380 U.S. 438, 443 n. 6, 85 S.Ct. 1061, 1064 n. 6, 13 L.Ed.2d 951 (1967) (affirming Board's authority to determine appropriateness of different bargaining units by decisions of general applicability). Adjudicated rules develop where a principle established in one case is applied to subsequent representation cases to determine appropriate bargaining units. *See, e.g., Big Y Foods v. NLRB,* 651 F.2d 40, 45 (1st Cir.1981) (presumption that separate meat department is appropriate); *NLRB v. New Enterprise Stone & Lime Company,* 413 F.2d 117, 118 (3rd Cir.1969) (separate warehouse unit appropriate where three conditions are met).

From the onset these cases are distinguished because not one of the cases cited by the Board involves unit determination in the health care industry. Thus, the express policy against proliferation has no bearing in these cases. In addition, rule-

---

**14.** When Congress was in the process of making changes to the Act in 1974, Senator Taft proposed a bill that he intended would prevent proliferation by statutorily designating only five permissible bargaining units in the health care institutions. *1974 Legis. History,* at 106–12. The AHA argues that Congress' rejection of that Bill is conclusive evidence that Congress did not envision pre-determined units. We are not con- vinced, and this is not how we reach the decision that pre-determined units do not prevent proliferation. A plausible reading of Congress' refusal to statutorily determine bargaining units would also be that the House and Senate believed that the agency which Congress had authorized to make these decisions had more expertise to do so.

making by adjudication is fundamentally different than a rule promulgated under the APA procedures, because an adjudicated rule evolves only in context where parties have litigated their unique concerns and can only be applied in a similar context. An adjudicated rule may be adapted to factual distinctions, whereas the Board's rule which predetermines units, necessarily ignores differences which, although the Board refers to them as subtle, may be the key to labor peace.[15]

Similarly misplaced is the Board's reliance on *Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). In *Heckler* the Supreme Court upheld the Secretary's use of medical-vocational guidelines, developed by rule-making, to determine a claimant's right to disability benefits, although the Social Security Act contemplates individualized hearings. *Heckler* is distinguishable. The individualized review of the claimant's case is not obviated by the Secretary's rules, because a hearing is required to determine the claimant's particular limitations and abilities before the Secretary can even use the guidelines. The determination of whether a job exists for a claimant once his or her particular qualifications are assessed, is no longer a question subject to factual distinctions, *Heckler* 461 U.S. at 467, 103 S.Ct. at 1957, unlike

the determination of unit appropriateness which depends on the dynamics of a specific health care institution. Finally, the Secretary does not claim any medical expertise and the guidelines replace the Secretary's reliance on a vocational expert. The Board's primary function and expertise, however, is supervising labor relations.

The AFL–CIO argues that preconceived determinations are inescapable, because as a practical matter the representation process could not function if the Board did not identify particular employee groups which constitute appropriate units. Employees must be aware of the Board's policy to exercise their right of self-organization and employers must also, to properly respond to representation claims. Thus, the AFL–CIO implies the Rule establishes, more expeditiously and less disengeniously, what the NLRB must do anyway. We agree, for representation procedures to function certain principles must be presumed. But these principles are more analogous to guidelines or rebuttable presumptions than to rules. Rule-making is inherently less flexible which means that health care employees will be encouraged, or perhaps even coerced, by the Rule to organize according to the eight established units even in facilities where such fragmentation is unnecessary.[16] And, without a doubt, this

**15.** We do not rely on *NLRB v. Wyman–Gordon,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969), where the Court notes that adjudicated precedent "guides future conduct in much the same way as though it were a new rule promulgated under the rule-making power." *Id.* at 771, 89 S.Ct. at 1432 (Black, J., concurring). The Supreme Court does not, as defendant argues, endorse rule-making, but criticizes the Board for using adjudication where rule-making and the procedures of the APA are authorized. Furthermore the Supreme Court's comments are not in the context of unit determinations.

Nor do we rely on *NLRB v. Metropolitan Life Insurance Co.,* 380 U.S. 438, 443 n. 6, 85 S.Ct. 1061, 1064 n. 6, 13 L.Ed.2d 951 (1965) where the Court noted "the Board may articulate the basis of its [unit determination] order by reference to other decisions and to general policies laid down in its rules...." This reference is *dicta,* however, and only endorses the view that in appropriate circumstance the Board will not be barred from using its section 6 rule-making authority.

**16.** For the last fifteen years the Board has explored several alternatives to establish a coherent policy for unit determination in the health care industry. The Board has been frequently criticized by the judiciary and accused of pursuing an erratic course. The Board's attempt to establish concrete policy through their rule-making authority may be laudable. Yet the simple fact that the Board was unable to develop criteria for unit determination without raising judicial concern in particular cases, where one health care institution was at issue, should have been indicative of the difficulties of a rigid, generally applied policy in a field where the institutions are so diverse.

This is not to say that a combination of rule-making and adjudication could not be beneficial. Rule-making could provide guidelines which facilitate representation for all parties (unions, employers and employees) yet leave room for adjudication to consider the particular dynamics of a hospital or other health care facility.

result does not prevent undue proliferation.[17]

III. CONCLUSION

In sum, we find, that section 9(b) of the NLRA does not entirely foreclose the Board from promulgating rules with respect to appropriate collective bargaining units. Congress, however, enunciated a specific concern for the vulnerability of the health care industry to labor unrest. In light of this vulnerability Congress admonished the Board to give due consideration to undue proliferation of bargaining units in this industry. A rule which designates an absolute number of appropriate units and mandates a particular division of the workforce, especially in the health care field where employees' work environment varies widely, is not responsive to Congress' express concern. In fact, as noted above, such a rule encourages, and perhaps coerces, fragmentation of the labor force within particular health care facilities.

A permanent injunction will issue where the plaintiff succeeds on the merits and if the balance of equities favors injunctive relief. For the reasons stated above the AHA has succeeded on the merits of its claim. The unique concerns in the health care industry favor injunctive relief. The appropriate remedy is to permanently enjoin the NLRB's Final Rule, 29 C.F.R. Part 103, establishing bargaining units in the health care industry, from taking effect.

The NLRB's Motion for Summary Judgment is denied and the petitions to intervene of the AFL–CIO, the Building and Construction Trades Department and the

American Nurses' Association are granted.[18]

SO ORDERED.

---

17. Because we find that the Board's Rule is inconsistent with the policy against proliferation of bargaining units in the health care industry, we need not address AHA's argument that the new Rule is arbitrary and capricious.

18. The AFL–CIO, the Building and Construction Trades Department and the American Nurses' Association (the "ANA") sought to intervene as

defendants. We found that they were not intervenors as of right (oral ruling, May 19, 1989). At that time we granted the AFL–CIO, the Building and Construction Trades Department and the ANA *amici* status and continued their Motion for Permissive Intervention. We now grant them status as permissive intervenors, pursuant to Fed.R.Civ.P. 24(b).