**CHILDREN'S HABILITATION CENTER, INC., Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

**Nos. 88–2538, 88–2735.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1989.

Decided Oct. 13, 1989.

Linda L. Eyestone, Scariano, Kula, Ellch & Himes, Chicago, Ill., for Children's Habilitation Center, Inc.

Aileen A. Armstrong, Collis Suzanne Stocking, Margaret G. Bezou, James M. Stephens, N.L.R.B., Washington, D.C., Ann C. Hodges, Katz, Friedman, Schur & Eagle, Chicago, Ill., Margaret G. Bezou, Donald J. Crawford, N.L.R.B., Albert Washington, General Service Employees Union, Chicago, Ill., for N.L.R.B.

Before CUMMINGS and POSNER, Circuit Judges, and GORDON, Senior District Judge.*

POSNER, Circuit Judge.

The Labor Board found that the five charge nurses employed by the Children's Habilitation Center—a residential facility that houses some 120 seriously ill and handicapped children and youths—are not supervisors within the meaning of section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11), and hence are eligible to vote in representation elections. The validity of that determination is the only issue before us, and it is controlled by two decisions rendered on the same day six years ago, *NLRB v. Res–Care, Inc.*, 705 F.2d 1461 (7th Cir.1983), and *NLRB v. American Medical Services, Inc.*, 705 F.2d 1472 (7th Cir.1983). The first affirmed, and the second reversed, determinations by the Board that charge nurses in nursing homes were not supervisors. The facility in the present case is functionally a nursing home, albeit for the young rather than for the old.

■ As we explained in *Res–Care*, the principal opinion, the word "supervisor" in the Act is a term of art, since the statutory definition—"any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent knowledge"—allows an employee to do some supervision without thereby becoming a supervisor under the Act. This frequently happens when the employee is a professional acting in accordance with professional norms. Examples are a lawyer directing paralegals and a registered nurse directing nurse's aides. See 705 F.2d at 1465.

■ In an effort to give practical meaning to the detailed but nondirective statutory definition, we inquired in *Res–Care* into the considerations of policy that inform the exclusion of supervisors from the protections of the National Labor Relations Act. We found two such considerations, closely related. See *id.* at 1465–66. The first is the maintenance of a reasonable balance of power between employer and union. The provision excluding supervisors is a legacy of the Taft–Hartley Act, which sought to correct what had come to be thought of as the Wagner Act's excessive tilt toward unions. If supervisors could form unions entitled to the protections of federal labor law (nothing in that law forbids supervisors' unions—the law just denies them the legal protections that it gives unions of nonsupervisory employees), the company would find it difficult to persuade its supervisors to replace striking workers so that the company would not

* Hon. Myron L. Gordon of the Eastern District of Wisconsin, sitting by designation.

have to shut down during a strike. More important (because not limited to a strike situation, and because, until recently, replacement workers were rarely used to defeat strikes), the company could lose control of its work force to the unions. The employees who controlled the hiring, discipline, assignment, promotion, layoff, and recall of the work force might be subject to control by the same union as the workers whom they were supposed to be directing, monitoring, disciplining, and otherwise controlling on the company's behalf.

The second policy behind the exclusion of supervisors is an attenuated version of the first. It is the danger not of full-blown syndicalism but of conflicts of interest if the same employee is both a union member and a master of the fates of other union members—if, in other words, his loyalties are divided between the employer and the work force. Even if the supervisor does not take the union's side on every occasion, the inevitable dilution of his commitment to the employer will impair the hierarchical discipline that is the hallmark of business organizations and that, judging by the test of survival, is a necessary condition of managerial efficiency. The employer may not lose control of the work force but the efficiency of his operation may be impaired.

To translate these policies into results in particular cases is a task for the Board, and we review its determinations with a lightish hand. How light? For different formulations compare *NLRB v. Res–Care, Inc., supra,* 705 F.2d at 1466, with *NLRB v. Don's Olney Foods, Inc.,* 870 F.2d 1279, 1281 (7th Cir.1989). More important than verbal niceties in the standard of review is judicial impatience with the Board's well-attested manipulativeness in the interpretation of the statutory test for "supervisor." See Note, *The NLRB and Supervisory Status: An Explanation of Inconsistent Results,* 94 Harv.L.Rev. 1713 (1981); *NLRB v. Res–Care, Inc., supra,* 705 F.2d at 1466; *NLRB v. St. Mary's Home, Inc.,* 690 F.2d 1062, 1067 (4th Cir.1982). An administrative agency, like any other first-line tribunal, earns—or forfeits—deferential judicial review by its performance.

■ Our analysis of the Board's determinations in *Res–Care* and in *American Medical Services* emphasized two considerations. They will continue to be our guiding lights in charge-nurse cases. The first is the ratio of supervisory to nonsupervisory employees under the competing positions of the parties; the second is the disciplinary authority of the alleged supervisors. The first consideration is central to the balance of power concern, the second to conflict of interest. In *Res–Care,* where we upheld the Board's determination that the charge nurses were not supervisors, the ratio of supervisors to nonsupervisors was 6 to 46 under the Board's theory (.13) and 13 to 39 (.33) under the company's; it was apparent that the company was classifying a large fraction of its employees as supervisors. In *American Medical Services* the ratio was 6 to 159 under the Board's theory (.04) and 23 to 142 under the company's (.16); it was equally apparent that the Board was thinning the company's supervisory ranks unduly.

■ Despite the importance that our decisions in charge-nurse cases attach to the ratio of supervisory to nonsupervisory employees, the Children's Habilitation Center did not place in evidence the total number of its employees, but only the number per shift—55. (At oral argument the company's lawyer gave the *total* number of employees as 55, but she must have misspoken.) That is not the relevant number, since collective bargaining units are not confined to a particular shift. The correct number is important, but is not in the record. The burden of persuasion is on the employer; if it insists that the relevant number is the number per shift, we shall not relieve *it* of this imprudent concession.

Seven employees are conceded to be supervisors, and there are five charge nurses. If the charge nurses are classified as supervisors the ratio of supervisory to nonsupervisory employees is 12 to 43 (.28); if they are not, it is 7 to 48 (.15). These figures place the case between *Res–Care* and *American Medical Services* insofar as the employer's preferred ratio is lower than the one rejected in *Res–Care* (.28 ver-

sus .33) while the Board's preferred ratio is higher than the one rejected in *American Medical Services* (.15 versus .04). The more pertinent comparison, however, is between the Board's ratio in *Res–Care*, .13, which we accepted, and the ratio the Board is contending for here, .16, which actually is higher. So looking at ratios alone we cannot say that the Board erred in excluding the charge nurses. On the Board's view there is one supervisor for every six or seven nonsupervisory employees on each shift, and, to repeat, it is the number of employees per shift, rather than the total number, that the employer in this case deems relevant.

Even if the total number of employees is twice as large as the number of employees per shift, and even if the parties had framed the case so that the total number of employees was (as it should have been) the relevant number, the ratio of supervisors to nonsupervisors under the Board's view would be greater than under the view that it took and we rejected in *American Medical Services.* But we emphasize that we are deciding this case as the parties framed it, not the more difficult case that would have been presented if the Center had presented the ratio of supervisory to all nonsupervisory employees rather than just employees on the night shift. Later we shall suggest a reason for the Center's tactic.

Turning to the matter of discipline, we note that during the six-month period covered by the record in *Res–Care* charge nurses had twice recommended the discharge of employees and the company had accepted the recommendations, yet we did not think that this evidence established disciplinary powers so extensive as to prove that the charge nurses were supervisors. In *American Medical Services,* in contrast, charge nurses had fired one employee and suspended another. There are no discharges or suspensions in the present case. The charge nurses issue written and oral warnings to employees of violations of the employer's rules, and the written warnings are placed in the employees' files, but the charge nurses have no responsibility for recommending discipline and any decision

as to discipline is made by the conceded supervisors. Although the Center argues that the charge nurses participate in the grievance proceedings brought by other employees, there is no evidence of this. All that the collective bargaining agreement with those employees requires is participation by the relevant supervisor. It begs the question to argue from this clause to the supervisory status of the charge nurses, yet that is the only ground for the Center's contention that the charge nurses participate in grievance proceedings. On this record, the charge nurses' responsibility for discipline is not so great as to make serious problems of divided loyalties inevitable.

The Center points to a number of conceded responsibilities of the charge nurses that are supervisory in character. In particular it emphasizes that during the night shift none of the conceded supervisors is on the premises and one of the five charge nurses is—in charge, though her supervisors are only a telephone call away. *Now* one understands why the Center lays such emphasis on the number of employees per shift; it wants to argue that on the night shift the ratio of supervisors to workers is zero unless the charge nurses are counted as supervisors. But the segmenting of the work day (or night) to manipulate the ratio of supervisors to employees is too facile a maneuver. A janitor is not a supervisor even though he is the only employee on the premises at night. Although the charge nurse on the night shift has a more responsible position than a janitor, the children are asleep at night and therefore the employees on duty at that time do not require active supervision, except in emergencies (and if they are medical emergencies they may not count for purposes of determining the charge nurses' supervisory responsibilities, as we are about to see). See *NLRB v. Res–Care, Inc., supra,* 705 F.2d at 1467. The less supervision required, the less acute is the conflict of interest created by allowing the "supervisor" to join a union protected by federal law. Of course in a different type of enterprise the night-shift supervisor might indeed be a supervisory

employee within the meaning of the National Labor Relations Act, as in *NLRB v. Ajax Tool Works, Inc.*, 713 F.2d 1307, 1309–11 (7th Cir.1983) (per curiam)—or might not be, see *NLRB v. Don Olney Foods, Inc., supra*, 870 F.2d at 1283. And in a different type of enterprise the ratios we have emphasized might have much less significance.

The most important point that the Center overlooks in emphasizing the supervisory responsibilities of the charge nurses—a point also overlooked in *NLRB v. Beacon Light Christian Nursing Home*, 825 F.2d 1076, 1079–80 (6th Cir.1987), a case in considerable but unacknowledged tension with our decisions in *Res–Care* and *American Medical Services*, neither of which *Beacon Light* mentions—is that nurses are professionals and their exercise of supervision is guided by professional training and norms. The charge nurses in this case are registered nurses, who are highly trained and responsible. Supervision exercised in accordance with professional rather than business norms is not supervision within the meaning of the supervisor provision, for no issue of divided loyalties is raised when supervision is required to conform to professional standards rather than to the company's profit-maximizing objectives. The charge nurses' nonprofessional supervisory responsibilities—initialing time cards of employees who have forgotten to punch them and summoning substitutes for employees who call in sick—appear to be too routine to create serious problems of conflict of interest should the charge nurses be unionized. The shift supervisor held to be a statutory supervisor in *NLRB v. St. Mary's Home, Inc., supra*, 690 F.2d at 1065–69, had more extensive discretionary responsibilities than here.

The Board is entitled to have its order ENFORCED.