60 F.3d 828
 149 L.R.R.M. (BNA) 3120
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
DST INDUSTRIES, INC., Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
and
International Union, United Automobile, Aerospace &
Agricultural Implement Workers of America, Intervenor.
 Nos. 94-5320, 94-5535.
 United States Court of Appeals, Sixth Circuit.
 July 10, 1995.
 
 Before: KENNEDY and JONES, Circuit Judges; and HOLSCHUH, District Judge.*
 PER CURIAM.
 
 
 1
 After a close election in which several ballots were contested, the NLRB certified the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America (UAW) to represent the employees of petitioner, DST Industries, Inc. DST refused to bargain with the employees, alleging that the ballots of four men should be opened and counted, as none of the four held a supervisory position. The NLRB found that DST engaged in unfair labor practices, and DST has petitioned this court to review the Board's orders. The NLRB has filed a cross-petition for enforcement. We affirm the Board's decision.
 
 I.
 
 2
 DST operates a highly sophisticated automotive manufacturing facility where it engages in designing, displaying, and marketing present and future automobile prototypes and specialty automobiles for the auto industry. DST also performs engineering and testing services on future car systems as requested by Ford Motor Company, including supplying employees on a temporary contract basis to perform specific mechanical and engineering work at various Ford facilities.
 
 
 3
 DST's Romulus plant is run by a plant manager who oversees various departments. Each department is headed by a "working leader" who reports directly to the plant manager. Each working leader is the highest-ranking authority in his department, and all the working leaders attend weekly supervisory meetings. They all receive the highest pay rates in their departments, and, unlike other employees, they keep their own time records instead of punching a time clock. The working leaders also receive special $500 Christmas bonuses and long-term disability benefits that are not available to other employees, and they park their cars in a reserved area in the Company's parking lot. This action centers around the status of John Fox, leader of the fiberglass department; Joe Mason, leader of the truck maintenance department; Tyrone Weaver, body shop floor manager; and Daniel Byrd, the only permanent employee at the company's Los Angeles plant. We will discuss the specific facts regarding each man below, but first we will set out the general background of this action.
 
 
 4
 On June 19, 1991, the workers at DST held an election on the issue of representation by the UAW. The initial tally showed the vote at 67 in favor of union representation and 61 against. Between DST and the Union, challenges were filed as to 26 ballots. A hearing officer conducted a hearing and issued a report and recommendation disposing of those challenges. As part of her report, the Hearing Officer recommended that the ballots of John Fox, Joe Mason, Daniel Byrd, and Tyrone Weaver not be counted, as all four men were supervisors. Over DST's objections, the NLRB adopted these recommendations and certified the UAW as the union representing DST's employees.
 
 
 5
 To test the certification, DST refused to bargain with the UAW. As part of this refusal, DST did not comply with the UAW's request to turn over certain information relating to DST's health care plans. The Board found that DST engaged in unfair labor practices, and DST now petitions this court to review the Board's decisions. The Board has cross-petitioned for enforcement.
 
 II.
 A. Legal Standard
 
 6
 The National Labor Relations Act defines "supervisor" as
 
 
 7
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 8
 29 U.S.C. Sec. 152(11). This court has reviewed a number of NLRB decisions applying this statute, and the relevant standards are clearly established:
 
 
 9
 The question of whether individuals should be accorded supervisory status is a mixed question of fact and law.... As such, the Board's determination regarding the supervisory status of the line operators is not to be overturned as long as there is substantial evidence in the record as a whole to support its finding....
 
 
 10
 ... The kinds of supervisory characteristics enumerated in [section 152(11) ] are listed in the disjunctive; therefore, "the exercise of anyone of [them] is enough to make one a supervisor." ... Additionally, this Court has recognized that regardless of the specific kind of supervisory authority at issue, its exercise "must involve the use of true independent judgment in the employer's interest before such exercise of authority becomes that of a supervisor." ...
 
 
 11
 ... This Circuit has emphasized that the mere performance of routine tasks or the giving of instructions to others is not sufficient to afford an individual supervisory status. The true test involves an inquiry into the significance of the individual's judgment which is usually determined by observing whether the individual "identif[ies] with the interests of the employer rather than the employees." ...
 
 
 12
 An individual does not become a supervisor merely because he possesses greater skills and job responsibilities than his fellow employees.... He must exercise independent judgment in performing his responsibilities.
 
 
 13
 NLRB v. Lauren Manuf. Co., 712 F.2d 245, 247-248 (6th Cir.1983) (citations omitted).
 
 
 14
 A decision as to whether an individual is a supervisor is a very fact-bound determination, and the Board has not always been consistent in applying section 152(11). See, e.g., Schnuck Mkts. v. NLRB, 961 F.2d 700, 704 (8th Cir.1992); Children's Habilitation Center v. NLRB, 887 F.2d 130, 132 (7th Cir.1989). Nevertheless, our circuit has held that this decision "calls into play the Board's 'special function of applying the general provisions of the Act to the complexities of industrial life.' " NLRB v. Aquatech, 926 F.2d 538, 548 (6th Cir.1991). Accordingly, we give the NLRB broad discretion in making these determinations. Williamson Piggly Wiggly v. NLRB, 827 F.2d 1098, 1100 (6th Cir.1987). We will review the Board's decision as to each of the four men's status seriatim.
 
 B. John Fox
 
 15
 John Fox is the working leader of the fiberglass department. He is responsible for managing that department and for completing projects on time and within budget. In carrying out these responsibilities, Fox assigns work to various employees after assessing their capabilities; his goal is to select the best and the quickest employee to perform a given task. Fox follows up on these assignments by supervising the work and inspecting the finished product. When he locates an error or a problem, he instructs employees to repair it.
 
 
 16
 Fox also possesses the authority to allow employees to leave work early and to sign their vacation requests. In addition, he evaluates the workload of his department and decides whether his workers should be transferred temporarily to relieve heavy workloads in other departments. In March 1991, when insufficient work existed to occupy the workers, Fox approached the plant manager about laying off Keith Tauriainen, the most junior fiberglass employee. Fox signed the layoff notice and informed Tauriainen of the decision.
 
 
 17
 Fox has also been involved in making decisions regarding employee wage increases. When DST decided to grant an across-the-board wage increase of up to 50 cents per hour, the plant manager accepted Fox's recommendation that one of the fiberglass employees, Lambro, should receive a raise of only 25 cents per hour. Fox informed Lambro that his work was not up to par.
 
 
 18
 These facts, coupled with the general facts discussed above, provide substantial evidence to support the Board's decision. DST argues that Fox's work is very similar to that of Gary Slezak, the working leader of the clay modelling department. The NLRB did not classify Slezak as a supervisor, and DST contends that the different treatment is arbitrary and capricious. Slezak, however, is not just the working leader of clay modelling--he is the only employee in that department. Thus, he does not have anyone to supervise. Slezak occasionally borrows workers from Fox, but the Board found that this was not sufficient to make him a supervisor. Because substantial evidence supports the Board's reasoning, we cannot overturn the decision.
 
 C. Joe Mason
 
 19
 Joe Mason is the working leader of the truck maintenance department, and, as such, has the responsibility for keeping a variety of vehicles in good repair. To accomplish this goal, Mason assigns work to the employees in the department and supervises the quality of their work. Mason has the authority to let employees in his division leave early and signs their vacation requests.
 
 
 20
 Mason has also been involved in the hiring process for his division. When prospective employee Jeff Pepper applied for a maintenance job, the plant manager gave the application to Mason and instructed him to interview Pepper. Mason did so and recommended that Pepper be hired. The plant manager accepted the recommendation, and Mason informed Pepper of the decision and advised him of his wages and the working conditions.
 
 
 21
 Like Fox, Mason has also recommended to the plant manager that a particular worker be laid off during a slow period. The plant manager accepted the recommendation, and Mason signed the layoff notice and informed the worker of the decision. Mason has also ensured that two reprimands were issued by another working leader to an employee who negligently caused serious damage to two company trucks.
 
 
 22
 These facts, coupled with the general facts discussed above, provide substantial evidence to support the Board's decision.
 
 D. Daniel Byrd
 
 23
 Although DST views Byrd as working out of the Romulus plant, Byrd is actually permanently assigned to the company's Los Angeles facility. Byrd's job is to ensure that vehicles are properly prepared and delivered to advertising agencies, who use them in television commercials and printed advertisements. Although Byrd is the only employee permanently stationed in L.A., he is not the only employee there. There are usually between two and nine other DST employees stationed there on temporary assignment from Romulus. Byrd has the authority to determine the size of his workforce. He is in frequent telephone contact with his supervisor in Romulus and informs his supervisor of how many employees he needs. His supervisor then sends that number out to Los Angeles.
 
 
 24
 Byrd sets priorities among the various jobs to meet deadlines and assigns work to the other employees at the plant according to their abilities. Byrd also supervises the work and exercises quality control authority. Once a vehicle is ready for use, Byrd prepares a written "location order" directing employees to deliver the cars to the site where the advertisement is being produced. Byrd maintains telephone contact with the employees who are on location. In addition, Byrd shares the other perks provided to working leaders in Romulus, including a higher pay rate, Christmas bonus, and keeping his own time records.
 
 
 25
 DST argues that Byrd exercises authority comparable to that of William Miglio, who is the assistant leader in Palm Springs. The Board concluded that Miglio was not a supervisor and allowed his ballot to be counted in the election. According to the Board, the primary difference between Miglio and Byrd is that Byrd is the highest-ranking authority in L.A., while Miglio reports to an on-site superior. The Board also found that Miglio did not exercise the same level of quality control authority as Byrd unless Miglio's supervisor was away. Once again, we feel compelled to reiterate that our review is only for substantial evidence; we do not review the Board's decisions de novo. Because substantial evidence does exist to support the Board's conclusions regarding Byrd's status, we cannot overturn them.
 
 E. Tyrone Weaver
 
 26
 Tyrone Weaver worked for three months as the body shop floor manager at DST. The body shop is the largest and busiest department at the Romulus plant and is headed by working leader Roger Hamilton. Hamilton was overburdened, so the plant manager hired Weaver to assist with Hamilton's duties. Weaver was to manage the body shop floor, freeing Hamilton up to handle office duties and travel on company business.
 
 
 27
 As floor manager, Weaver handed out assignments and supervised the work. Weaver spent most of his time overseeing the work of others, and very little time actually performing manual labor himself. Weaver also possessed the authority to let employees leave early.
 
 
 28
 When Hamilton was away, Weaver filled in as working leader for the department. As such, he had authority to sign employees' vacation requests and to initial their timecards. On one occasion when Hamilton was gone, Weaver even handled a voluntary layoff of one employee, including gaining approval from the plant manager and signing the notice.
 
 
 29
 The Board also found that DST treated Weaver more like a supervisor than an employee. Weaver attended most of the working leaders' weekly meetings, received a salary closer to Hamilton's wage rather than that of other body shop employees, and kept his own time records. These facts provide substantial evidence to support the Board's decision.
 
 III.
 
 30
 For the foregoing reasons, we find that the Board's decision regarding the supervisory status of the four challenged men must stand. Accordingly, the Board correctly certified the UAW as the representative of DST's employees and can require DST to bargain with the UAW. We therefore GRANT the National Labor Relations Board's cross-petition for enforcement.
 
 
 
 *
 The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation