**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**and**

**United Food and Commercial Workers, Local No. 1444, Intervening– Petitioner,**

**v.**

**GRANCARE, INC., d/b/a Audubon Health Care Center, Respondent.**

**No. 97–3431.**

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1998.

Decided Sept. 4, 1998.

Rehearing and Suggestion for Rehearing En Banc Granted, Panel Decision Vacated Nov. 30, 1998.

John D. Burgoyne (argued), Appellate Court, Enforcement Litigation, Washington, DC, for Petitioner.

Christopher J. Johnson (argued), Beck, Chaet, Loomis, Molony & Bamberger, Milwaukee, WI, for Respondent.

Scott D. Soldon, Naomi E. Soldon (argued), Previant, Goldberg, Uelman, Gratz, Miller & Bruegeman, Milwaukee, WI, for Intervenor–Petitioner.

Before COFFEY, KANNE and EVANS, Circuit Judges.

KANNE, Circuit Judge.

This matter comes before us on an application for enforcement of an order of the National Labor Relations Board ("NLRB" or "Board") requiring GranCare, d/b/a Audubon Health Care Center ("GranCare" or "Audubon"), to bargain with United Food and Commercial Workers Union, Local 1444, which the NLRB had certified as the exclusive representative of a collective bargaining unit of GranCare employees. GranCare refused to bargain, and the NLRB now asks us to enforce its order. Resolution of this issue requires us to decide whether GranCare's licensed practical nurses ("LPNs") employed at Audubon who have some managerial role in the facility meet the statutory definition of supervisor under § 152(11) of the Labor Management Relations Act ("LMRA" or "the Act"), 29 U.S.C. § 141 *et seq.* Because we conclude that substantial evidence does not support the NLRB's finding that these LPNs are not supervisors, we deny the petition for enforcement.

## I. HISTORY

### A. Factual Summary

GranCare operates a 282 bed nursing home in Bayside, Wisconsin. It is licensed by the State of Wisconsin and operates seven days a week on a three-shift daily basis. The nursing home is divided into six different units on five floors.

The largest department in the nursing home is the nursing department. It consists of the Director of Nursing, an Assistant Director of Nursing, approximately 19 registered nurses ("RNs"), approximately 38 LPNs, approximately 90 certified nursing assistants ("CNAs"), 3 restorative aides, and 6 unit secretaries.

The CNAs assist residents with their basic needs. They groom, feed, toilet, and walk the residents and change their bed linens. CNAs report to a charge nurse. A charge nurse can be either an RN or LPN, and the record indicates that at the nursing home facility operated by GranCare, all the LPNs

act as charge nurses.[1] Each unit during each shift has at least one charge nurse.

Charge nurses have numerous responsibilities, and we set forth here only those duties that impact our decision today. Charge nurses assign duties to the CNAs and direct their work. A nursing scheduler makes out a work sheet for the day, assigning CNAs to particular units. Within the unit, the LPN charge nurse for that unit assigns the CNAs to specific patients. LPNs can reassign a CNA from one resident to another. Likewise, they determine how many residents a CNA will service. LPNs also schedule breaks for the CNAs around the needs of the residents and may reassign or change break times as required. LPNs monitor the CNAs' work, and they can instruct a CNA to do a task again or in a different way if the LPNs believe the task is being carried out improperly. Charge nurses can send a CNA home if the CNA is sick or if the CNA is impaired in any way that could affect patient care. LPNs may be disciplined for failing to monitor the CNAs' work, and several LPNs have been verbally counseled for failing to discipline CNAs. On at least one occasion, the Director of Nursing has written up an LPN for a CNA's failure to do her job properly. In addition to these responsibilities, the LPNs work with the CNAs in administering patient care.

There are some acts relating to assignment and scheduling that GranCare does not allow the LPNs to perform. LPNs cannot make changes in the daily work schedule by rearranging CNAs' hours. The Director of Nursing must authorize such changes. The Director of Nursing likewise approves permanent schedule changes, vacations, leaves of absence, and overtime.

### B. Procedural History

This case initially came before the Board on two representation petitions filed by the Union: one seeking Board certification as the representative of a unit composed of GranCare's LPNs acting as charge nurses and the other seeking certification of a unit of GranCare's service and maintenance employees excluding the LPNs. In response, GranCare contended that LPNs were not employees under the Act, but instead were statutory supervisors and as such were outside the Act. The Board consolidated the petitions and conducted a hearing. Subsequently the Board's Regional Director issued a Decision and Direction of Election, in which he found that the LPNs were employees under the Act because their assignment and direction of the CNAs were not done in the interests of the employer and the LPNs' discipline of the CNAs did not require independent judgment. The Director thus directed an election in a unit combining the LPNs and other service and maintenance employees.

GranCare sought review of the Director's decision. While the petition for review was pending, but before the election, the Supreme Court decided *NLRB v. Health Care & Retirement Corp. of Am.*, 511 U.S. 571, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994). The issue before the Court was the Board's "patient care analysis"; that is, the Board's position that a "nurse's supervisory activity is not exercised in the interest of the employer if it is incidental to the treatment of patients." *Id.* at 576, 114 S.Ct. 1778. Finding that the Board's analysis was contrary to the LMRA's statutory language, the Supreme Court concluded that the LPNs at issue were statutory supervisors under the Act. Despite the intervening Supreme Court decision, an election was held at Audubon consistent with the unit description set forth in the Decision, but the ballots were impounded until resolution of GranCare's petition for review.

The Board granted review and remanded the case to the Director with instructions to reconsider his ruling in light of *Health Care & Retirement Corp.* and certain Board decisions issued after the Director's decision. The Director reopened the hearing and allowed additional evidence limited to events occurring after the first hearing. The Director then issued a Supplemental Decision on Remand, in which he reaffirmed the con-

---

**1.** Because all the LPNs at GranCare's Audubon facility act as charge nurses, we will use the terms "LPN," "charge nurse," and "LPN charge nurse" interchangeably to mean an LPN functioning as a charge nurse.

clusion that the LPNs are not supervisors, this time relying on the justification that the LPNs did not exercise independent judgment in their assignment, direction, and discipline of the CNAs. The Supplemental Decision directed that the impounded ballots be opened and counted. The Union won the election by a vote of 92 to 16, with 5 challenged, non-determinative votes.

GranCare sought review of the Supplemental Decision, but the Board denied its request. GranCare then filed objections to the election, contending that the delay between the conducting of the election and the opening of the ballots was substantial enough to question the election results, especially considering the heavy turnover of employees during this period. The Director issued a Second Supplemental Decision and Certification of Representative, in which he rejected GranCare's objections and certified the Union as the representative of the service and maintenance employees including the LPNs. GranCare once again sought review and the Board refused. GranCare refused to bargain with the Union. The Union filed an unfair labor practice charge against GranCare, and the Regional Office issued an unfair labor practice complaint. Following the usual administrative proceedings, the Board issued a Decision and Order finding that GranCare's refusal to respond to the Union's request to meet and bargain constituted an unlawful refusal to bargain in violation of §§ 8(a)(5) and (1) of the Act. The Board ordered Gran-Care to cease and desist those activities and to meet and bargain with the Union as exclusive representative of the employees in the approved unit. It is this order that the Board seeks us to enforce.

## II. Analysis

### A. The Labor Management Relations Act

Congress enacted the LMRA in 1935. *See Health Care & Retirement Corp.*, 511 U.S. at 573, 114 S.Ct. 1778. As originally written, the Act did not exclude supervisors from the definition of employees accorded protection under the Act; supervisors thus were able to organize as part of bargaining units and negotiate with the employer. *See id.* Although employers complained that including supervisors under the Act's protection created an imbalance between labor and management, the Supreme Court decided in 1947 that, absent language to the contrary, supervisors were within the Act's coverage. *See Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 490, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

Congress reacted to *Packard* by amending the statute specifically to exclude supervisors. *See Health Care & Retirement Corp.*, 511 U.S. at 573, 114 S.Ct. 1778. It created the following definition of supervisor:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

Determining the supervisory status of a person or group of persons requires resolution of three questions. "First, does the employee have authority to engage in 1 of the 12 listed activities," *Health Care & Retirement Corp.*, 511 U.S. at 574, 114 S.Ct. 1778; *see also NLRB v. Winnebago Television Corp.*, 75 F.3d 1208, 1213 (7th Cir. 1996) (stating that it is settled law in this Circuit that an employee need only possess one of the iterated criteria), or the authority to effectively recommend such action? "Second, does the exercise of that authority require 'the use of independent judgment'? Third, does the employee hold the authority 'in the interest of the employer'?" *Health Care & Retirement Corp.*, 511 U.S. at 574, 114 S.Ct. 1778. Each question must be answered in the affirmative to find that an employee is a supervisor under the Act. The burden of proving an employee's supervisory status is on the one asserting it; in this case the burden falls on the employer. *See NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1313 (7th Cir.1998).

One consideration in our application of the statutory factors arises from the tension be-

tween the statutory test for supervisors, who are excluded from the Act's protection, and the Act's inclusion of "professional employees." *See Health Care & Retirement Corp.*, 511 U.S. at 588–89, 114 S.Ct. 1778 (Ginsburg, J., dissenting) (noting that the Act's inclusion of professionals is in tension with its exclusion of supervisors because many professional employees will meet the statutory definition of supervisor). This tension has led the Board to distinguish between "independent judgment," and "professional" or "technical" judgment, finding that if an employee exercises the latter, that employee is not a supervisor. *See, e.g., Nymed Inc., United Indus. Workers Local 424*, No. 3–RC–10166, 1996 WL 48265, at *9 (N.L.R.B. Feb. 2, 1996) (finding that LPNs use their technical judgment to prepare comprehensive care plans for patients and instruct CNAs to implement that plan in a routine way). However, simply renaming the exercise of independent judgment does not change its character nor should it change the outcome under the statutory test for supervisors. As the Supreme Court noted in *Health Care & Retirement Corp.*, "[t]he Act does not distinguish professional employees from other employees for purposes of the definition of supervisor in § 2(11). The supervisor exclusion applies to 'any individual' meeting the statutory requirements, not to 'any non-professional employee.'" 511 U.S. at 581, 114 S.Ct. 1778. Thus, our recognition that LPNs are "if not full-fledged professionals, at least sub-professionals," *NLRB v. Res–Care*, 705 F.2d 1461, 1466 (7th Cir.1983), does not affect our analysis as to whether they are supervisors under the Act. We apply the statutory three-prong test to LPNs in the same way we would apply it to any other group.

Another wrinkle bears addressing. In *Res–Care*, 705 F.2d at 1461, and *Children's Habilitation Ctr., Inc. v. NLRB*, 887 F.2d 130 (7th Cir.1989), we looked to two "guiding factors" to give practical meaning to the statutory definition of supervisors. First, we examined the ratio of supervisors to employees under the competing positions of the parties. *See Children's Habilitation Ctr.*, 887 F.2d at 132; *Res–Care*, 705 F.2d at 1468. We then looked at the disciplinary authority of the alleged supervisors. *See Children's*

*Habilitation Ctr.*, 887 F.2d at 132; *Res–Care*, 705 F.2d at 1468. We found these factors particularly relevant because they reflect two of the interests underlying Congress's exclusion of supervisors from the Act: a concern for the balance of power between employer and union and a desire to avoid conflicts of interest that necessarily would arise if an employee were both a union member and a master of the fates of other union members. *See Res–Care*, 705 F.2d at 1465–66.

While such secondary indicia of supervisory status may assist our determination, our first and primary responsibility is to enforce the Act according to its own terms. *See Health Care & Retirement Corp.*, 511 U.S. at 580, 114 S.Ct. 1778. In *Health Care & Retirement Corp.*, the Supreme Court expressed some doubt about resorting to policy considerations when defining terms in the Act. *See id.* (suggesting that the Act may not permit consideration of the potential for divided loyalties). Since we recently recognized such secondary indicia are not determinative on their own, *see E & L Transp. Co. v. NLRB*, 85 F.3d 1258, 1270 (7th Cir.1996), and, "[a]s with all issues of statutory interpretation, the appropriate place to begin our analysis is with the text itself," *Bass v. Stolper, Koritzinsky, Brewster & Neider*, 111 F.3d 1322, 1324 (7th Cir.1997), we decline in this instance to engage in an analysis of secondary indicia of status or of the policy supporting the exclusion of supervisors from the Act. Because we are able to resolve this case according to the statutory language, we heed the Supreme Court's admonition that the Act is to be enforced according to its own terms.

## B. Standard of Review

We uphold the NLRB's findings of fact if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Supreme Court has defined substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v.*

*NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). While a deferential standard, "Congress has ... made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. 456.

 While we follow the general standard of review outlined above, we also recognize that "[a]n administrative agency, like any other first-line tribunal, earns—or forfeits—deferential judicial review by its performance." *Children's Habilitation Ctr.*, 887 F.2d at 132. In determining supervisory status, the Board's "well-attested manipulativeness," *see id.*, has earned it little deference. *See Winnebago Television Corp.*, 75 F.3d at ·1214; *Children's Habilitation Ctr.*, 887 F.2d at 132.

 Reduced deference is particularly appropriate in this case because the Board, in its first decision, all but found that the LPNs at issue were supervisors absent the patient care analysis. The Board stated, "[a]ssignment of work and direction of the CNAs is done in the LPNs' technical capacity. Thus, while at times it may constitute the utilization of independent judgment, it is judgment utilized in the Nurses' treatment of patients and does not constitute the exercise of supervisory authority in the interests of the employer." Since the nurses did not exercise their authority "in the interests of the employer," the Board concluded that the LPNs were not supervisors under the Act. However, in *Health Care & Retirement Corp.*, the Supreme Court rejected the Board's patient care analysis. Thus, in its Supplemental Decision after remand, the Board was precluded from relying on its previous analysis.

Although the testimony at the second hearing established that the LPNs had at least the same, if not more, supervisory duties than they had at the time of the first hearing, the Supplemental Decision found that the LPNs are not supervisors because they do not dispatch their duties utilizing independent judgment. Thus the Board reached the same result but relied on a different statutory factor, independent judgment, notwithstanding the fact that it had previously conceded that the LPNs' activities "at times may constitute the utilization of independent judgment." Given this history, we see little reason to accord significant deference to the Board determination in this case. *Accord Providence Alaska Med. Ctr. v. NLRB*, 121 F.3d 548, 556 (9th Cir.1997) (Noonan, J., dissenting) (Only after the Supreme Court rejected its patient care analysis did the Board's new interpretation of independent judgment see "the light of day. Deference should not be accorded an interpretation that it has taken 50 years to reach and ... has been brought forward as an end run around [*Health Care & Retirement Corp.*] as decided by the Supreme Court.").

## C. Applying the Statutory Factors

If the LPN charge nurses fall within the Act's definition of supervisors, then it was not an unfair labor practice for GranCare to refuse to bargain with them. Our task, therefore, is to determine whether the LPNs at GranCare are supervisors under the Act.

 Neither party disputes that the LPNs act in the interests of the employer. Thus we focus on whether the LPNs engage in one of the twelve listed activities and use independent judgment in so doing. At a minimum, the LPNs have the "authority to assign." As described above, LPNs direct the CNAs in the completion of their tasks and match up CNAs with particular patients. The LPNs may alter the CNA-patient pairing at their discretion. They also determine when the CNAs will take their breaks, and they have the authority to change break times as needed. This control over the direction of the CNAs is sufficient to establish that the LPNs have "authority to assign" under the Act.

 The LPNs at GranCare also meet the "responsibly to direct" criterion. "To be responsible is to be answerable for the discharge of a duty or obligation.... In determining whether direction in any particular case is responsible, the focus is on whether the alleged supervisor is held fully accounta-

ble and responsible for the performance and work product of the employees he directs." *NLRB v. KDFW–TV, Inc.*, 790 F.2d 1273, 1278 (5th Cir.1986) (citations and quotations omitted); *see also Northeast Utils. Serv. Co. v. NLRB*, 35 F.3d 621, 625 (1st Cir.1994). The evidence in the record establishes that the LPN charge nurses are responsible for the actions of the CNAs on their unit. As the Director of Nursing testified:

> [The LPNs] are responsible for what happens and when they give direct orders to the CNAs, that they are responsible to make sure that it is followed through on and if they do not, they would be held accountable for what wasn't done on the floor and I would come to them.

Tr. of Hrg. at 275, *In re GranCare*, No. 30–RC–5576 and 30–RC–5577 (N.L.R.B. June 24, 1996). The Director of Nursing also testified that she has orally counseled LPNs for failure to discipline a CNA, and that on at least one occasion she gave a written disciplinary notice to an LPN when a CNA under her charge was not doing her job correctly. The LPNs therefore responsibly direct the CNAs on their unit.

Since the LPNs meet at least one of the iterated criteria in § 152(11), this case boils down to whether the LPNs utilize independent judgment in assigning or responsibly directing the CNAs. Given the entire record, we cannot say that the Board's conclusion that the LPNs do not exercise independent judgment, but instead utilize their professional judgment in a routine or clerical way, is supported by substantial evidence. First, the LPNs exercise independent judgment in assigning CNAs to patients. The charge nurses must consider the needs of the patient, the skill and experience of the CNA, and the staff available for different tasks. That the LPNs may call upon their professional expertise in making these judgments in no way diminishes their independence.

Additionally, these judgments are not simply routine or clerical. There is no evidence in the record that LPNs follow a specified procedure to assign CNAs to patients, nor is there evidence suggesting that LPNs consult with a RN supervisor over the assignment process. The same is true when the LPNs schedule and rearrange CNA break times. These independent scheduling decisions made throughout each shift are sufficient to establish the LPNs' supervisory status under § 152(11).[2] *See American Diversified Foods, Inc. v. NLRB*, 640 F.2d 893, 896–97 (7th Cir.1981) (finding that Arby's restaurant shift managers who were responsible for assigning counter employees to specific jobs were supervisors).

While the above activities are sufficient to establish that GranCare's LPNs are supervisors, the record also indicates that the LPNs are responsible for supervising the CNAs' tasks, and that LPNs are held responsible when CNAs improperly perform their duties. Monitoring the CNAs' performance requires independent judgment as to whether the tasks are completed properly and in accordance with acceptable levels of patient care. The fact that the CNAs' duties are often menial and repetitive is of no import to the analysis, for we have held that "the menial nature of the tasks performed and the limited skills of ... coworkers ... does not mean that [the employee] was not called upon to use his own judgment in the course of the job." *NLRB v. Adam & Eve Cosmetics*, 567 F.2d 723, 728 (7th Cir.1977). Additionally, determining the level of supervision each CNA requires involves the use of independent judgment and is not merely routine or clerical. The LPN must assess each CNA's level of experience and responsibility to determine how closely he or she must be monitored. Since the LPNs thus responsibly direct the CNAs utilizing independent

---

2. In *Res–Care* we found that the LPNs' assignment of CNAs to particular patients was insufficient to support supervisory status. *See* 705 F.2d at 1467–68. We came to this conclusion because the LPNs in that case were significantly constrained in their choices and left with little discretion. *See id.* at 1468. In addition, we relied on the patient care analysis that was rejected by the Supreme Court in *Health Care & Retirement Corp. See id.* In the present case, the LPNs have complete discretion in assigning tasks; thus while this case and *Res–Care* are factually similar, they are not identical and our decision in *Res–Care* does not constrain our analysis here. As we noted in *Res–Care*, the determination of supervisory status is highly factbound, and it "would add little to our analysis to discuss other decisions involving nurses." *Id.*

judgment in the interest of the employer, this activity provides additional support for our conclusion that these LPNs are supervisors under the Act.

Because we find that GranCare's LPNs are supervisors under the Act, GranCare did not engage in an unfair labor practice by failing to bargain with them. The Board's petition to enforce its order therefore is DE-NIED.

TERENCE T. EVANS, Circuit Judge, dissenting.

The nursing department at the Audubon Health Care Center has, in descending order of authority, a director of nursing, an assistant director of nursing, 19 registered nurses (RN's), 38 licensed practical nurses (LPN's), and 90 certified nursing assistants (CNA's). Undoubtedly, the director, her assistant, and the RN's (who are, by the way, salaried) are "supervisors" as that term is defined by the Labor Management Relations Act. Undoubtedly also, the CNA's are not supervisors under the Act. This case presents a fairly routine dispute concerning the LPN's (like the CNA's they are clock punchers, not salaried employees), who are betwixt and between: Are they "supervisors" or are they not? The Board's factual determination that their duties do not make them supervisors is, in my view, supported by substantial evidence. Today's opinion, however, means that the supervisor-versus-employee lineup at Audubon is 59 to 90. Such an unwieldy, top-heavy setup is bizarre, to say the least.

In my view, the LPN's are much closer to CNA's than they are to RN's. The few minor extra responsibilities that put LPN's above CNA's in Audubon's nursing department do not make them supervisors. A supervisor-to-employee ratio at Audubon of 21 to 128 would be much more realistic. Because the majority fails to reach this logical conclusion, I dissent.