**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RES–CARE, INC., d/b/a Hillview Health Care Center, Respondent.**

No. 82–1923.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1983.

Decided April 26, 1983.

Elliott Moore, David Fleischer, Asst. Counsel for NLRB, Washington, D.C., for petitioner.

Joseph A. Yocum, Evansville, Ind., for respondent.

Before CUDAHY and POSNER, Circuit Judges, and HOLDER, District Judge.*

* Honorable Cale J. Holder of the Southern District of Indiana, sitting by designation.

POSNER, Circuit Judge.

The respondent operates a 72-bed nursing home in Illinois that provides both intermediate and intensive care. The Labor Board directed an election for bargaining representative of the seven licensed practical nurses employed by the home. The union won the election (by one vote), the respondent refused to bargain with the union, and the Board brought unfair labor practice proceedings against the respondent and issued an order to bargain which it asks us to enforce. The respondent makes three alternative arguments to us: that its licensed practical nurses are supervisors and therefore not protected by the National Labor Relations Act, that a bargaining unit limited to licensed practical nurses is improper, and that the swing vote for the union was cast by a nurse who should not have been allowed to vote, because she was about to quit.

Section 2(3) of the Act, 29 U.S.C. § 152(3), excludes from the definition of "employee," and hence from the Act's protection, any "supervisor," defined in section 2(11), 29 U.S.C. § 152(11), as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent knowledge." Both provisions were added in 1947 by the Taft-Hartley Act.

Although section 2(11)—at least its first part, up to "if"—appears to define "supervisor" broadly, the appearance is deceptive. Supervision in the elementary sense of directing another's work is excluded; a supervisor under the statute must have authority over another's job tenure and other conditions of employment. This distinction is important because the Act allows professionals—doctors, teachers, etc.—to bargain collectively, see section 2(12), 29 U.S.C. § 152(12); *Lumbermen's Mutual Casualty Co. of Chicago,* 75 N.L.R.B. 1132

(1948), yet most professionals have some supervisory responsibilities in the sense of directing another's work—the lawyer his secretary, the teacher his teacher's aide, the doctor his nurses, the registered nurse her nurse's aide, and so on. See *NLRB v. Yeshiva University,* 444 U.S. 672, 690 n. 30, 100 S.Ct. 856, 866 n. 30, 63 L.Ed.2d 115 (1980). The distinction between supervision in the statutory sense and work direction by a professional is mentioned with approval in the legislative history of the 1974 Health Care Act Amendments, which put nonprofit health care institutions under the National Labor Relations Act though without amending section 2(11). See H.Rep. No. 1051, 93d Cong., 2d Sess. 7 (1974); S.Rep. No. 766, 93d Cong., 2d Sess. 6 (1974), U.S. Code Cong. & Admin.News, p. 3946.

To understand the statutory definition of "supervisor" you must understand its role in the overall scheme of the National Labor Relations Act. The Wagner Act was of course intended to promote unionization. See, e.g., 49 Stat. 449, § 1 (preamble of Act); S.Rep. No. 573, 74th Cong., 1st Sess. 2, 4, 6 (1935); 78 Cong.Rec. 9888 (1934) (remarks of Representative Connery). Taft-Hartley applied some brakes, so that the balance of power between companies and unions would not shift wholly to the union side. The exclusion of supervisors is one of the brakes. If supervisors were free to join or form unions and enjoy the broad protection of the Act for concerted activity, see section 7, 29 U.S.C. § 157, the impact of a strike would be greatly amplified because the company would not be able to use its supervisory personnel to replace strikers. More important, the company—with or without a strike—could lose control of its work force to the unions, since the very people in the company who controlled hiring, discipline, assignments, and the other dimensions of the employment relationship might be subject to control by the same union as the employees they were supposed to be controlling on the employer's behalf. We might become a nation of worker-controlled firms. Syndicalism is not the theory of the amended National Labor Relations Act.

■ Stated less dramatically, allowing supervisors in the special sense in which section 2(11) uses the term to bargain collectively could create serious conflicts of interest. A supervisor, by definition, has authority to control the conditions of employment "in the interest of the employer," and if he belonged to the same union as the employees he was charged with responsibility for firing, laying off, rewarding, or promoting, and could engage in protected concerted activity with those employees, he would have a bad case of divided loyalties. See *Packard Motor Co. v. NLRB,* 330 U.S. 485, 494–95, 498, 67 S.Ct. 789, 794, 796, 91 L.Ed. 1040 (1947) (dissenting opinion). The conflict is attenuated if he is just charged with supervising the employees' work, which as we have said is not supervision within the meaning of the statute.

■ These reflections on the purpose of section 2(11) are well supported by the legislative history, see H.Rep. No. 245, 80th Cong., 1st Sess. 13–17 (1947); S.Rep. No. 105, 80th Cong., 1st Sess. 4–5 (1947), and provide a framework for deciding whether the Board misapplied the statute in holding that the respondent's licensed practical nurses were employees rather than supervisors. Although the nurses may have some supervisory authority, the "if" clause in section 2(11), the legislative history indicating that the clause was intended to exclude from the definition of supervisor "straw bosses," "lead men," and other low-level employees having modest supervisory authority, see S.Rep. No. 105, *supra,* at 4, and the fact that these nurses are, if not fullfledged professionals, at least sub-professionals, indicates that their possession of some "supervisory" authority, loosely defined, need not prevent the Board from classifying them as employees rather than supervisors. But clearly we are in a gray area, where it is necessary to consider whether the balance of power and conflict of interest concerns that lie behind section 2(11) justify the Board's finding.

■ Technically, the Board's finding is one of fact, rather than a legal interpretation; and the proper standard of judicial review is therefore a deferential one. But it is a finding that necessarily leans heavily on an interpretation of the statute; and while the Board is entitled to some judicial deference in interpreting its organic statute as well as in finding facts, it would be entitled to even more if it had awakened its dormant rulemaking powers for the purpose of particularizing the application of section 2(11) to the medical field. Cf. Peck, *The Atrophied Rule-Making Powers of the National Labor Relations Board,* 70 Yale L.J. 695 (1961); Gorman, Basic Text on Labor Law 17 (1976). By dealing with the issue entirely on an ad hoc, case-by-case basis, the Board has laid itself open to charges that its decisions applying section 2(11) have been more than tinged by opportunism— that it construes "supervisor" broadly when the question is whether an employee's unlawful act can be imputed to the employer and narrowly when the question is whether the employee is protected by the Act. See Note, *The NLRB and Supervisory Status: An Explanation of Inconsistent Results,* 94 Harv.L.Rev. 1713 (1981); *NLRB v. St. Mary's Home, Inc.,* 690 F.2d 1062, 1067 (4th Cir.1982).

■ The respondent's nursing home has 6 employees who are conceded to be supervisors (the administrator of the home, 3 department heads, and 2 registered nurses), 39 other employees who are conceded not to be supervisors (15 nurses' aides, plus maintenance, laundry, food, and other nonmedical workers), and the 7 licensed practical nurses. Much of what the licensed practical nurses do is not supervision within the meaning of section 2(11) by any stretch of the imagination—administering medication, filling out patients' charts, accompanying doctors on their rounds, and performing other standard nursing chores. But you need not be a full-time supervisor to be covered by the statute. See, e.g., *Southern Indiana Gas & Elec. Co. v. NLRB,* 657 F.2d 878, 884 (7th Cir.1981). And while these licensed practical nurses are hourly rather than salaried employees, this also is unimportant, or at least not crucial; many foremen are also hourly employees, yet foremen

undoubtedly are supervisors within the meaning of the statute. Nor, in light of the statutory words "effectively to recommend such action," is it important that the respondent's licensed practical nurses do not have formal or final authority to hire, fire, lay off, promote, reward, or discipline; most first-line supervisors—foremen are again an example—do not. Although on the evening (3 p.m. to 11 p.m.) and night (11 p.m. to 7 a.m.) shifts the licensed practical nurses are the highest-ranking employees on the premises, this does not ipso facto make them supervisors. A night watchman is not a supervisor just because he is the only person on the premises at night, and if there were several watchmen it would not follow that at least one was a supervisor.

With all this underbrush out of the way we may now consider what these nurses do while on duty that might count as supervision under the statute. They make written evaluations of the nurse's aides on forms provided by the respondent. These forms become part of the employment record of the nurse's aide but a licensed practical nurse cannot cause a nurse's aide to be fired by giving her a poor evaluation or cause her to be promoted by giving her a superlative evaluation. At least, nothing of this sort has happened yet. The employee evaluation forms are a recent innovation, their significance is far from clear, and so the Board was not required to infer just from them that the licensed practical nurses have authority "effectively to recommend" promotion or discharge of nurse's aides.

■ Once during the six-month period covered by the record a licensed practical nurse recommended that an employee—a laundry worker caught sleeping on the job—be discharged, and the recommendation was followed. Although any employee could recommend discharge in such a case, an employee whose responsibility it is to make such recommendations, and whose recommendations therefore carry a special weight with the employer and are normally or at least commonly followed, is a supervisor. But with very little evidence in the record that these licensed practical nurses

have such a responsibility, the Board did not have to be persuaded by a single instance in which a recommendation for discharge was made and followed that they do.

■ Although the administrator of the nursing home testified that licensed practical nurses have authority to suspend employees for brief periods for violating specific rules set forth in a handbook that each employee receives when he is hired, she could give only one instance of this during the six months. A nurse's aide showed up drunk. "The LPN there said she didn't know what she was supposed to do," so she called the administrator, and the administrator directed that the employee be fired. The Board was not required, on the basis of this evidence, to find that the licensed practical nurses are authorized to suspend other employees.

■ Suspension and discharge are not the only disciplinary sanctions, of course; and any power to discipline or effectively to recommend discipline makes the holder of the power a supervisor under the statute. The employer cannot discipline, and therefore cannot control, his work force if the people he uses to mete out the discipline on his behalf have a conflict of interest, being union members asked to discipline fellow union members and protected by section 7 if they refuse. But evidence that these licensed practical nurses have the power to impose or effectively to recommend *any* disciplinary sanction is limited very largely to the administrator's general assertions, which the case of the drunken nurse's aide undercut.

■ The licensed practical nurses' most significant exercise of supervisory authority comes in connection with assigning nurse's aides. From the rules of the nursing home regarding patient care and directions given by the patients' doctors the licensed practical nurses learn what care each patient requires that a nurse's aide can provide and then decide which aide shall provide what care to which patients. They also pass on requests by nurse's aides to be excused from work because of illness, send home

aides who are ill, advise the administrator if fewer aides are needed on a shift, and schedule aides for overtime work when extra help is needed. Unquestionably, then, they have authority in the interest of the employer to assign nurse's aides, which is supervision under the statute. But the question remains whether their exercise of this authority is merely routine, and does not require independent judgment. The licensed practical nurses carry out their responsibilities for work assignments within tight constraints which leave them with little discretion. For example, if they need another nurse's aide to work overtime or replace an aide who is ill they "just go down the list" provided by their employer; they cannot pick and choose among nurse's aides. The licensed practical nurses' greatest discretion is in deciding which nurse's aide shall do what task, but this discretion is exercised in accordance with a professional judgment as to the best interests of the patient rather than a managerial judgment as to the employer's best interests. It is no different from a doctor's telling his nurses which patients to provide what care to, which is not supervision under the statute.

Stepping back from the details of the licensed practical nurses' job responsibilities and examining the facts in light of the policies behind section 2(11), we do not think that if these nurses are held to be protected by the Act the employer will be helplessly overmatched, lose control of his work force, have no loyal cadre of supervisors. Any influence over the employment prospects and conditions of the nurse's aides that the licensed practical nurses enjoy by virtue of the employee evaluation form and their alleged but unproved power to suspend for rule infractions was sufficiently slight to allow the Board to conclude that letting them join a union and bargain collectively would not create serious conflicts of interest within the nursing home. Moreover, if the licensed practical nurses were classified as supervisors, almost one-third of the nursing home's staff would be barred from the protections of the Act, and the Board could reasonably believe that the balance of power would shift too far toward the employer.

Now "conflict of interest" and "balance of power" are not the terms the Board itself uses in deciding section 2(11) issues; usually it just compares the activities of the employees in question with the words of the statute, and that is what it did here. Whatever the limitations of this approach, we cannot call it improper, it supports the Board's result in this case, and the fact that the result is reasonable in terms of statutory purpose provides additional support.

It would add little to our analysis to discuss other decisions involving nurses. The application of section 2(11) in the hospital and nursing-home field has given rise to extensive but highly fact-bound litigation. We cannot find a previous case that is just like this one, though *NLRB v. St. Francis Hospital of Lynwood,* 601 F.2d 404, 421 (9th Cir.1979), and *Beverly Enterprises v. NLRB,* 661 F.2d 1095, 1099–1110 (6th Cir. 1981)—both cases where the Board's order was enforced—resemble this case; nor have we been able to derive general principles from cases involving dissimilar facts. It is enough that the Board's result in this case is not in conflict with prior case law (in *St. Mary's Home, Inc., supra,* the Fourth Circuit held that a licensed practical nurse was a supervisor, but she "performed exactly the same functions and exercised exactly the same powers" as a registered nurse whom the Board had classified as a supervisor, 690 F.2d at 1068), does no violence to the language of the statute, and, most important, is consistent with the purposes that animate that language as nearly as we can infer them from the place of section 2(11) in the overall scheme of the Act. Still, this is a close case, so if the Board had come out the other way we might not reverse.

The next question is whether the Board erred in allowing the licensed practical nurses to form their own collective bargaining unit rather than merging them into the unit consisting of the nurse's aides and other low-level workers. An employer does not have to bargain with the representative of an inappropriate unit, and that is reason enough for the respondent to have

appealed the Board's unit determination. In addition, the union lost the election in the other unit by a substantial margin, and it would still have lost if the licensed practical nurses had been part of the unit and voted as they did, and the nursing home would then have been union-free. But there are also larger stakes in the unit-determination question. Employers generally prefer fewer rather than more collective bargaining units because the more units there are the fewer workers have to agree in order to call a strike. If all the nursing home's 46 nonsupervisory employees constituted a single collective bargaining unit it would take a vote of 24 to authorize a strike. But if the 7 licensed practical nurses can form their own unit it takes a vote of only 4. Of course, the smaller the unit the less the impact of a strike, but if the unit consists of key workers—and the licensed practical nurses play a key role in the nursing home's operation, for the respondent could not operate the nursing home two-thirds of the time with nurse's aides as the only medical personnel on the premises—a strike by the unit can be very costly to the employer. This is especially true in a service industry, where an interruption of production cannot be made up in advance by producing more for inventory.

The other side of the coin is that the larger the unit, the more heterogeneous its composition is likely to be. Heterogeneity makes it hard for the union to carry out its legal duty of fair representation of each member of the unit, creates conflicts within the unit that reduce support for the union, and reduces the benefits of unionization to those workers left out of whatever majority coalition comes to dominate the unit. So if unit proliferation creates problems for the employers, limiting the number of units creates problems for unions and workers. We are again in the presence of an issue that involves the balance of power between labor and management.

The statute gives little guidance to the Board on where to strike the balance but does suggest that any tilt should be in favor of unions. Section 9(b) of the Act, 29 U.S.C. § 159(b), requires the Board to "decide in each case whether, *in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter,* the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . ." (Emphasis added.) A grant of power so broad and so nearly standardless virtually requires the courts to review unit determinations under the deferential "abuse of discretion" standard, and that is in fact the normal standard used in unit determination cases. See, e.g., *Wil-Kil Pest Control Co. v. NLRB,* 440 F.2d 371, 375 (7th Cir.1971); *Lammert Industries v. NLRB,* 578 F.2d 1223, 1225 (7th Cir.1978). Consistently with the statutory slant, the Board's unit determinations emphasize homogeneity ("community of interest") rather than the adverse effect of multiple units on the employer. See The Developing Labor Law 217–22 (Morris et al. eds., ABA Section of Labor Relations Law 1971).

A reviewing court, therefore, could hardly set aside the Board's decision certifying a unit of licensed practical nurses—unless perhaps the Board tried to certify two units of licensed practical nurses in the same institution—provided the normal principles of unit determination apply to the health care industry. The licensed practical nurses in this case are a homogeneous group, having different interests from nurse's aides, and from maintenance workers, who have been combined with the nurse's aides into a single collective bargaining unit; and, as we have noted, if undue proliferation would make unions too powerful, undue consolidation would make employers too powerful. The joker in the deck, however, is the alleged congressional policy against proliferation of collective bargaining units in the health care industry. When Congress extended the National Labor Relations Act to nonprofit health care institutions in 1974, it did not amend section 9(b), but both committee reports state that "due consideration should be given by the Board to prevent proliferation of bargaining units in the health care industry." S.Rep. No. 766, 93d

Cong., 2d Sess. 5 (1974); H.Rep. No. 1051, 93d Cong., 2d Sess. 7 (1974). Behind this admonition lay concern that, as a service industry producing a uniquely noninterruptible service, the health care industry was more vulnerable to strikes than most industries and that a proliferation of bargaining units would increase that vulnerability. Proliferation was a big danger because, although many health care institutions, such as the nursing home in this case, have few employees, those they do have are divided among a number of professional and vocational specialties, each of which could plausibly be assigned to a separate bargaining unit under the broad language of section 9(b)—a unit composed of key employees, who could paralyze the institution by striking.

■■■ There is a question how much weight we should give the committees' admonition. If Congress passes a statute, the committee reports may provide important evidence of legislative purpose. But Congress did not enact any statute in 1974 dealing with bargaining units. It did not amend section 9(b), and maybe therefore, as argued in the dissent in *Mary Thompson Hospital, Inc. v. NLRB*, 621 F.2d 858, 864 (7th Cir.1980), the statement in the committee reports should be given no more weight than any other remote post-enactment legislative history would be given—which is not much, see, e.g., *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117–18 and n. 13, 100 S.Ct. 2051, 2060–61 and n. 13, 64 L.Ed.2d 766 (1980). On the other hand, Congress did change the law in 1974—it put nonprofit health care institutions under the National Labor Relations Act for the first time in 27 years—and maybe the committees' statement should be viewed as a source of guidance to the courts in interpreting the impact of the amendment on the whole Act; by changing the coverage of a statute, you can also change its meaning. In any event, the circuits including ours have treated the statements as authoritative, see, e.g., *NLRB v. West Suburban Hospital*, 570 F.2d 213 (7th Cir. 1978); *Mary Thompson Hospital, Inc., supra*; *NLRB v. Mercy Hospital Ass'n*, 606

F.2d 22 (2d Cir.1979); *NLRB v. HMO Int'l/Calif. Medical Group Health Plan, Inc.*, 678 F.2d 806, 808–09 (9th·Cir.1982), and we are not disposed to reexamine the issue here; it would in any event not change our result.

For there is still the question what amount of proliferation is undue. Since, so far as appears, the respondent's nursing home does not employ any doctors, its two registered nurses are conceded to be supervisors, and the only other employees besides the licensed practical nurses have already been combined into a single unit, the maximum number of separate units that could be recognized if the Board is affirmed would be two unless the composition of the nursing home's work force should change. Moreover, the licensed practical nurse unit recognized by the Board in this case is actually a unit of all "technical employees" —a category of subprofessional employees that the Board has devised. Although, as it happens, the nursing home does not employ any technical employees other than licensed practical nurses, should it hire any other technical employees they would automatically be included in the same unit with these nurses; they would not be eligible to constitute a separate unit.

■■■ A unit of technical employees including licensed practical nurses was upheld in *NLRB v. Sweetwater Hospital Ass'n*, 604 F.2d 454, 458 and n. 7 (6th Cir. 1979), against a charge of undue proliferation. See generally Bumpass, *Appropriate Bargaining Units in Health Care Institutions: An Analysis of Congressional Intent and Its Implementation by the National Labor Relations Board*, 20 Boston College L.Rev. 867, 905–08 (1979). Although the Board seems to be applying a per se rule entitling the technical employees of any health care institution to form their own unit, and the rule has been criticized, *id.* at 908, we cannot quarrel with its application in a case such as this where it yields only a few units. For though it might seem that "undue proliferation" could equally well refer to the absolute number of units, the number relative to the size of the institution, or the number relative to the hetero-

geneity of the work force, we doubt that the last of these possibilities is really encompassed by the term. The traditional "community of interest" standard for unit determination prevents the Board from breaking up a homogeneous group of workers into two or more units, and the only problem is that the standard might not prevent the formation of numerous units even in a small nursing home or hospital, because health care institutions tend as we have said to have heterogeneous work forces despite their frequently small size. Congress' concern was with the Board's pressing the logic of its traditional standard in the health care field without regard to the number of units that might result, either absolutely or relatively to the institution's size. And some number larger than two is required to trigger this concern. It is a pretty fair inference from the legislative history that four or fewer units, if otherwise suitable on "community of interest" grounds, would not have been thought undue. See S. 2292, 93d Cong., 1st Sess. (1973); 120 Cong.Rec. 12944 (1974); *Trustees of the Masonic Hall & Asylum Fund v. N.L.R.B.*, 699 F.2d 626, 631 and n. 12 (2d Cir.1983). We cannot find any case where allowing a maximum of two units in a health care facility has been thought to be undue proliferation, and we do not think this should be the first. A different result might be required if there were no significant differences in pay or training or job responsibilities between the licensed practical nurses and the nurse's aides—but there are; or if there were fewer licensed practical nurses—but seven, though a small number, is more than 15 percent of the total nonsupervisory work force of the nursing home.

The last question in the case is whether one of the licensed practical nurses, Miss West, should have been allowed to vote; she cast the deciding vote for the union. On July 27, Miss West notified the respondent that she was resigning effective August 10. She was scheduled to work only four days between July 27 and August 10—August 3, 4, 8, and 9—but she did not work on August 4, because of an illness in her family, or on August 8 or 9, because on

August 7 she arranged for another employee to substitute for her on those days in exchange for her working in that employee's place on August 10 and 11—which she never did, either, because she resigned as of August 10 after all. The election was on August 6. The respondent argues that since Miss West's last day of actual work was August 3, she should not have been allowed to vote.

But she was still employed by the respondent when she voted, and the Board's unvarying policy is that any employee may vote, even if he has a fixed intention of quitting immediately after voting, as happened in *NLRB v. General Tube Co.*, 331 F.2d 751 (6th Cir.1964). Of course, an argument could be made that no one should be allowed to vote in an election if he is going to leave the jurisdiction before the results of the election are transformed into policy, for in that event he does not have any stake in the election and cannot be expected to vote as responsibly as one who does. By this reasoning Miss West would not be allowed to vote for President if she were planning to emigrate to Australia before Inauguration Day or if she were terminally ill and not likely to live till then. But our political system does not attempt to make nice distinctions of this sort among voters, and in the absence of any suggestion in the National Labor Relations Act that Congress wanted the Board to make such distinctions in elections for collective bargaining representatives we cannot say that it is required to do so, and we need not decide whether it could do so if it wanted. There is rapid turnover of workers in many American companies, and if it were a litigable question whether each worker casting a vote in a union election was likely still to be employed when the union sat down to bargain with the employer the regulation of union campaigns would be greatly complicated. If the respondent were allowed to show that Miss West did not return to work after the election, though she was scheduled to do so, we suppose the union would have to be allowed to show that she was later rehired by the respondent, if she were (it is not unusual for a worker to leave a firm and later return to it). Miss West had in fact

rejoined the respondent once already, in the month before the election.

 The truth is that many people who vote in elections do not have a great stake or interest in the outcome; but nothing in the National Labor Relations Act requires the Board to insist that the franchise in union elections, unlike the political franchise, be limited to those who do. Thus *Choc-ola Bottlers, Inc. v. NLRB,* 478 F.2d 461 (7th Cir.1973), where the employee's discharge took effect immediately before the election and this court held he could not vote as he was not an employee when the election was held, is distinguishable.

The Board's order shall be

Enforced.