**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

United Steelworkers of America, AFL–CIO/CLC, Intervenor,

v.

**CHARDON RUBBER COMPANY, Respondent.**

No. 02–1427.

United States Court of Appeals, Sixth Circuit.

Nov. 21, 2003.

Ann Marie Scarpino, National Labor Relations Board, Office of the General

Counsel, Aileen A. Armstrong, Dep.Asso.Gen.Counsel, Charles P. Donnelly, Jr., Washington, DC, for Petitioner.

Daniel M. Kovalik, Angela E. Pace, Assistant General Counsel, Pittsburgh, PA, for Intervenor.

Gary W. Spring, Roetzel & Andress, Akron, OH, for Respondent.

Before BOGGS, Chief Judge; NORRIS and CLAY, Circuit Judges.

CLAY, Circuit Judge.

Petitioner, National Labor Relations Board ("NLRB" or "the Board"), and Intervenor, United Steelworkers of America, AFL–CIO/CLC, filed an application for enforcement of an NLRB order of September 20, 2001, finding Respondent, Chardon Rubber Company, in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1) and (5). Petitioner seeks to compel Respondent to negotiate with Intervenor's representatives of a proposed bargaining unit in one of its plants, following a contested representation election in which Petitioner disqualified five ballots that were cast against Intervenor, thereby affording Intervenor a narrow majority of the votes in an poll that it would have otherwise lost. For the reasons set forth below, we ENFORCE the NLRB's order.

## BACKGROUND

### Procedural History

Intervenor has attempted to organize Respondent's business on numerous occa-sions. The events giving rise to the present case arose out of the election of October 6, 2000, in which forty-three voters cast ballots on the issue of whether to certify Intervenor as the exclusive collective bargaining representative of employees of Respondent. Thereafter, six votes were challenged by Intervenor. These six votes-those of five Shift Leaders and one Quality Manager-were sufficient to alter the outcome of the election.[1]

The Board held a hearing to determine whether the contested votes should be counted. Intervenor argued before the Board that the five Shift Leaders and one Quality Manager in question fell within the NLRA definition of "supervisors," meaning that the NLRA would prohibit their votes from being counted in an election to certify a collective bargaining representative.[2] Intervenor offered three employees as witnesses: Tammy Hall, who had previously worked as a Shift Leader for approximately three years but held a different post at the time of the election, Ruth Roggenkamp, and Barbara Graham. Respondent offered two witnesses, Shift Leader Shawna McCord and Plant Manager Jonathon L. Lytle.

The NLRB Hearing Officer, Peter M. Godenschwager, issued a report to the Board on December 18, 2000, concluding that the challenges to the ballots of the five Shift Leaders were well taken and recommending that the challenges be sustained. The report denied the challenge to

1. Excluding the six contested votes, twenty-one votes were cast in favor of certifying Intervenor as the collective bargaining representative, and sixteen votes were cast against certifying Intervenor.

2. Under the NLRA, only "employees" are entitled to vote in an election to certify a collective bargaining representative. 29 U.S.C. § 159(a) ("Representatives designated or se-lected for the purposes of collective bargaining by the majority of the *employees* in a unit appropriate for such purposes, shall be the exclusive representatives of all the *employees* in such unit for the purposes of collective bargaining ....") (emphasis added). "The term 'employee' ... shall not include ... any individual employed as a supervisor...." *Id.* § 152(3).

the Quality Manager's ballot but noted that the Shift Leaders' votes by themselves were sufficient to alter the outcome of the election. On March 19, 2001, in reliance on the report, a three-member panel of the Board certified Respondent as the exclusive collective-bargaining representative of the employees in the bargaining unit.

On April 2, 2001, Intervenor requested that Respondent recognize it as the exclusive collective bargaining representative of the voters who participated in the October 6, 2000 election. Intervenor also requested that Respondent begin collective bargaining. Respondent did not acquiesce to the requests. On May 21, 2001, Intervenor filed an unfair labor practice charge with Petitioner, alleging a violation of 29 U.S.C. § 158(a)(5). Intervenor mistakenly brought the charge against "Chardin Rubber" instead of "Chardon Rubber." Intervenor failed to forward the charge to Respondent's representative, instead addressing the charge to Gary Spring, an attorney who represented Respondent in the past and who presently represents Respondent but had not entered an appearance in this matter. The notice of the unfair labor practice charge had the proper postal address, and Respondent learned of the pending unfair labor practice proceedings. Respondent admitted that it had refused to bargain with Intervenor.

Petitioner upheld the unfair labor practice charge in an order dated September 20, 2001. Petitioner ordered that Respondent begin collective bargaining and that Respondent post a notice in its facility affirming its commitment to its employees' rights under the NLRA. In April of 2002, Petitioner requested this Court enforce its order. This Court granted Intervenor's motion to intervene and now rules on Petitioner's application for enforcement of its September 20, 2001 order.

### Substantive Facts

Respondent operates a rubber injection molding facility in Alliance, Ohio, which fabricates rubber parts for appliances. Respondent's plant consists of fourteen presses operated by five separate crews or shifts, twenty-four hours a day, seven days a week. Each shift includes a crew of one Shift Leader and between eight to ten Operators. Respondent also employs six other individuals whom all parties agree qualify as "supervisory" personnel: a Plant Manager, a Personnel Administrator, a Production Scheduler, a Process Engineer, a Maintenance Technician, and a Mold Engineer.

Respondent employs five Shift Leaders, one for each separate crew that Respondent employs. The Shift Leader's job description reads:

> Operates rubber injection press; Make appropriate work assignments based on training and knowledge; Maintain Housekeeping; Must work well with others; Must have high school diploma or equivalent; Adhere to a plant safety rules & standards; Report production/Q.A. information correctly; Quick recognition and communication concerns; Work in an independent environment; Gives direction & communicates priorities; Writes accident reports; and Tow motor license.

(J.A. at 18.) Jonathan Lytle, Plant Manager, testified extensively at the NLRB hearing about the duties and powers Shift Leaders have:

> A shift leader coordinates the activities on any given shift from ... the assignments through the material handling and the finished goods and the unloading trucks. Just the activities that take place throughout the day. Including

training, trouble-shooting, relieving presses at break time throughout the entire shift. (J.A. at 196). When Lytle leaves the premises, Respondent maintains a log with contact information so that Shift Leaders know whom to contact with equipment or process problems and any employee issues that arise. Shift Leaders may call Lytle to deal with production issues or employee problems. Other characteristics and attributes of the Shift Leaders' position are described in the analysis below, as they bear on the present case.

## DISCUSSION

First, we must examine three procedural issues. Secondly, because we conclude that none of the procedural issues is dispositive, we must decide whether Petitioner's determination that Shift Leaders are "supervisors" comports with the National Labor Relations Act.

## I.

Three procedural issues were raised, any one of which, if meritorious, would influence our disposition of this case. The first two issues are raised by Respondent, who argues that defects in Intervenor's service render the order unenforceable and that Intervenor's failure to contest past elections estops it from contesting the present one. The third issue is raised by Intervenor, who argues for summary enforcement of the order on the grounds of Respondent's failure to contest one of the Board's findings.

### A. Service of the Charge

Respondent argues that Petitioner's alleged failure to comport with the rules for service of a charge is a fatal defect. The regulations provide:

Upon the filing of a charge, the charging party shall be responsible for the timely and proper service of a copy thereof upon the person against whom such charge is made. Service may be made personally, or by registered mail, certified mail, regular mail, or private delivery service. With the permission of the person receiving the charge, service may be made by facsimile transmission or by any other agreed-upon method.

29 C.F.R. § 102.14(a).

Service is ordinarily construed as a jurisdictional issue. *See, e.g, Elec. Workers Pension Trust Fund of Local Union 58, IBEW v. Gary's Elec. Serv. Co.,* 340 F.3d 373, 380 (6th Cir.2003). We review issues of jurisdiction *de novo. See, e.g., U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers,* 330 F.3d 747, 750 (6th Cir.2003).

Respondent cites two defects in Intervenor's service of the charge: the misspelling of Respondent's name in the charge and the addressing of the charge to the wrong party.

The first defect was that Intervenor's charge cited "Chardin Rubber" instead of the proper name of Respondent, "Chardon Rubber." (J.A. at 125.) Petitioner has stated that a typographical error in the charge is irrelevant as long as Respondent received actual notice. *Sewell–Allen Big Star,* 294 N.L.R.B. 312, 328 (1989) ("A misnomer of a respondent in a charge and complaint is not sufficient ground to quash the complaint where respondent has actual notice of the charge and complaint and files an answer thereto and participates in the hearing. . . ."). Respondent received actual notice of the charge and later filed a response to Petitioner's complaint (which properly named "Chardon Rubber") and participated in the hearing. Respondent was not prejudiced by the error. The misspelling does not render the order unenforceable.

The second defect was that Intervenor attempted to serve Gary Spring, an attorney not employed at Respondent's Alliance address nor designated as Respondent's exclusive representative.[3] Respondent argues that it never authorized Spring to accept service on its behalf. *See, e.g., Williams v. Jones*, 11 F.3d 247, 251 (1st Cir.1993) (" 'Service of process is not effectual on an attorney solely by reason of his capacity as an attorney, [but] the party must have appointed his attorney as his agent for service of process.' ") (citations omitted).

■ Respondent's argument is of no avail. Intervenor mailed a copy of the charge to Respondent, notwithstanding that the name listed in the address was that of Spring. Respondent had notice of the charge from the copy mailed to its address (and perhaps also from Spring, who represents Respondent as counsel[4]). On May 15, 2001, Spring wrote to Intervenor, "I will be representing Chardon Rubber with respect to its dealings with [Intervenor] at its Alliance plant." (J.A. at 148.) Given Spring's relationship as a counsel of Respondent, Intervenor's reliance on Spring's statement was not unreasonable. Again, Respondent had actual notice of the charge and was not prejudiced. The technical flaws in the service address do not serve as a basis for our declining to enforce one of Petitioner's orders. *See NLRB v. Process & Pollution Control Co.*, 588 F.2d 786, 789 n. 1 (10th Cir.1978).

## B. Estoppel

■ Respondent argues that Intervenor's failure to object to the identical bargaining unit composition in the three previous elections estops Intervenor from objecting now. Respondent argues that at the very least an evidentiary hearing was in order on this matter. This Court has already rejected the use of equitable estoppel to prevent a party who originally agrees to the composition of a bargaining unit from objecting later. In *Newspaper Drivers & Handlers Local No. 372 v. NLRB*, 735 F.2d 969, 971 (6th Cir. 1984), we stated, "equitable estoppel cannot be invoked to prevent a company from challenging the 'employee status' of workers it had previously recognized as employees." The same principle applies, so that equitable estoppel cannot be invoked to prevent a union from challenging the employee status of workers it had previously recognized as employees. Respondent was not entitled to an evidentiary hearing. The petition cannot be defeated on grounds of estoppel based upon past election practices.

## C. Summary Enforcement

Intervenor argues for summary enforcement of the order on the grounds that Respondent failed to contest the Board's finding that Shift Leaders possess authority to discipline other employees or to effectively recommend discipline.[5] Where a party fails to contest the Board's findings, "courts may summarily enforce the Board's order with regard to those issues." *NLRB v. Talsol Corp.*, 155 F.3d 785, 793 (6th Cir.1998) (citations omitted). But Respondent did contest the finding in ques-

---

**3.** Intervenor listed Spring as the "employer representative" and mailed a copy of the charge to Respondent's address, with Spring's name listed on the address, and faxed another copy directly to Spring, at his law firm's fax number. (J.A. at 149, 150.)

**4.** Spring, in fact, appears on behalf of Respondent on appeal.

**5.** This finding would provide sufficient grounds for enforcement of the order, under 29 U.S.C. § 152(11).

tion. (Respondent's Brief at 20–22.) Consequently, summary enforcement is not appropriate.

## II.

Having concluded that procedural issues do not dispose of this case, we face the issue of whether Petitioner's determination that Shift Leaders are "supervisors" comports with the National Labor Relations Act.

This Court reviews the NLRB's factual determinations, and its application of the law to a particular set of facts, for substantial evidence on the record as a whole. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477–78, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *ITT Automotive v. NLRB,* 188 F.3d 375 (6th Cir.1999); *Turnbull Cone Baking Co. v. NLRB,* 778 F.2d 292, 295 (6th Cir.1985). Substantial evidence is more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Our review of the record must consider evidence that runs contrary to the NLRB's findings. *See DTR Indus. v. NLRB,* 39 F.3d 106, 110 (6th Cir.1994). However, as long as the record as a whole *contains* substantial evidence supporting the NLRB's findings, this Court must sustain those findings even if we might have reached a different conclusion upon *de novo* review. *See Universal Camera,* 340 U.S. at 493, 71 S.Ct. 456, 95 L.Ed. 456. Finally, this Court generally defers to the credibility determinations of the NLRB, particularly where the "record is fraught with conflicting testimony and essential credibility determinations have been made." *Tony Scott Trucking, Inc. v. NLRB,* 821 F.2d 312, 315 (6th Cir.1987).

The applicable code provision has two clauses, both of which must be fulfilled for an employee to be a "supervisor." A "supervisor" is

■ any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if [2] in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

The first clause is satisfied by establishing the authority of the employee to engage in or effectively recommend any single one of the activities listed in section 152(11), even if the employee has no authority to engage in or to effectively recommend any of the other enumerated activities. *Beverly Enterprises v. N.L.R.B.,* 970 F.2d 1548, 1552 (6th Cir.1992). As stated in *Highland Superstores, Inc., v. NLRB,* 927 F.2d 918, 920–21 (6th Cir. 1991), the second clause modifies the first:

As Judge Posner has noted, the first of the two clauses of § 2(11) gives the definition of "supervisor" an initial appearance that turns out to be deceptively broad. If it stood alone, the first clause would make "supervisors" of, among others, anyone responsible for "supervision in the elementary sense of directing another's work...." *NLRB v. Res–Care,* 705 F.2d 1461, 1465 (7th Cir.1983). The first clause does not stand alone, however, and the second clause—the portion following the "if"—imposes a significant qualification.

In the present case, the Hearing Officer determined that the Shift Leaders had the authority to "effectively recommend" the "hire, retention and discharge of employees." (J.A. at 97.) The authority to "effectively recommend" hiring or discharge

would suffice to qualify the Shift Leaders as "supervisors." [6] However, the NLRB did not fully adopt these exact findings. The Board adopted the finding that Shift Leaders have the authority to effectively recommend hiring.[7] Additionally, although the Hearing Officer never explicitly found that Shift Leaders possess authority to "discipline" other employees or to effectively recommend "discipline," two of the three members of the Board panel adopted such a finding.[8]

First, we review the Board's finding that Shift Leaders have the authority to recom-

6. We decline to decide whether retention can be a separate authority from discharge.

7. One of the three-member NLRB panel adopted the finding that Shift Leaders have authority to hire or to effectively recommend hiring. (J.A. at 123) ("the shift leaders are the only individuals who decide whether to hire job applicants referred from the temporary agency"). Another member adopted the Hearing Officer's findings in full, thus finding that Shift Leaders have the authority to effectively recommend hiring. The third member did not find that Shift Leaders have authority to hire or to effectively recommend hiring. *Id.*

8. Two of the three-member NLRB panel found, "shift leaders exercise the discretion in determining whether to record an employee's late arrival, thereby causing that employee to receive points under the Employer's progressive discipline system." *Id.*

9. The "off the street" process involved a joint meeting between the Plant Manager, Shift Leaders, and the applicant. In the process, the Plant Manager also meets with the Shift Leaders, without the applicant being present. The Plant Manager and Shift Leaders make "a mutual decision to either hire or reject the applicant by 'majority rule' voting." (J.A. at 93.) Although the Shift Leaders do not have the authority to hire, a reasonable mind could conclude that their role in the voting would have constituted the power to "effectively recommend" and is "not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11).

mend hiring. The NLRB Hearing Officer's Report described the "undisputed testimony" of one of Intervenor's witnesses, former Shift Leader Tammy Hall. Hall testified that Respondent had used two methods to hire employees: "off the street" and through temporary agencies. It is clear that there was substantial evidence on the record as a whole to indicate that Shift Leaders possessed the authority to effectively recommend hiring through the "off the street process." [9] But this fact was not necessarily relevant to the issue at hand, because apparently the "off the street process" was not used in the two

There is contrary evidence on the record but not enough that a reasonable mind could not conclude that the Shift Leaders' role in the "off the street" hiring process met the statutory criteria. When asked at the NLRB hearing whether the process was a majority vote, Plant Manager Lytle stated, "No. The process was more of a recommendation process . . . as a first step in the hiring phase." (J.A. at 199.) The characterization as a "recommendation" leaves open only the issue of whether the recommendation was an "effective" one. Clearly it was an effective recommendation. Lytle was asked, "can you think of any instances where . . . shift leaders might have one opinion and you had a different one, and your opinion prevailed?" (J.A. at 206.) Lytle responded, "I think that there's probably been a couple of those, yes." *Id.* When asked to recall a specific instance, Lytle stated, "I think I do recall—boy, you're going to hit me on names here, and it's going to be tough, but—uh, Bambi something—uh, that I hired in and everybody else in the group said, 'Don't hire her in.' " *Id.*

Lytle, it appears, took pains to recall an instance of having gone against the Shift Leaders' recommendation. The Hearing Officer found it significant that Lytle could only recall one such instance-the Hearing Officer stated, "Lytle was able to recall only one incident when he went against [a Shift Leader's] recommendation." (J.A. at 96.) Lytle could have easily specified that the only reasons he had so rarely gone against the Shift Leaders' recommendations was that he had already reached the same conclusions on his own, but Lytle never said this.

years before the hearing-during this time, Respondent exclusively used temporary agencies. Solely on the basis of Shift Leaders' role in the temporary agency hiring process, the Board found that Shift Leaders possess the authority to hire or to effectively recommend hiring.[10]

When hiring is through temporary agencies, Shift Leaders provide an orientation and tour of the facility and also complete an evaluation form. As the Hearing Officer stated, the evaluation form "provides for the acceptance or rejection of the employee by the Shift Leader reflected by his or her signature in the space provided." (J.A. at 93.) In addition, the Hearing Officer stated, "Hall testified that, at least on the third shift, there is no additional review of the prospective employee before he or she is 'hired.' There was no contradictory testimony on this point." *Id.* Viewed standing alone, the evaluation report of the Shift Leaders would be sufficient evidence to allow a reasonable mind to find that Shift Leaders exercise independent judgment, of a non-routine, non-clerical nature, in effectively recommending that job applicants be accepted or rejected.

Yet there was countervailing testimony that must be considered. Lytle testified that the form filled out by the Shift Leaders only comes into play at the stage in the process when employees are brought on for a temporary trial period. Lytle was asked "so at this stage in the game, you haven't hired anybody. What you're trying to determine is ... do they even want to serve a temporary period of time in the shop?" (J.A. at 201.) Lytle responded that that was correct. *Id.*

Lytle went on to describe the Shift Leaders' role in the ultimate decision on whether or not to permanently hire the employees, after the trial period. Lytle stated, "[when] a temporary reaches its 30 or 60 days, whatever ... there would be recommendations that would come from shift leaders." (J.A. at 202.) Lytle stated that other recommendations would come from the quality group and that computer system efficiency data would also factor into the ultimate hiring decisions. A final interview with Lytle would be the final step in the process.

Lytle's testimony does not alter the evidence of the record as a whole so much that a reasonable mind might not find that the Shift Leaders make effective recommendations as to the process of hiring through temporary agencies. The Hearing Officer in this case found credibility problems with Lytle that he did not find with Hall.

■   Additionally, the Board was under no compulsion to accept the definition of "hire" in the question that asked Lytle, "so at this stage in the game, you haven't hired anybody," in describing the temporary workers being taken on for a trial period. (J.A. at 197, stating that a Mr. Ondrey conducted the direct examination of Lytle.) The Board was not bound to accept the definition of "hire" offered by the question to Lytle and by Lytle's response. Lytle did not dispute the importance of the evaluation form that Shift Leaders fill out, recommending the acceptance or rejection of the applicant who had been referred by the temporary agency. It was reasonable for the Hearing Officer to conclude that the power to effectively recommend a trial period constitutes the power to effectively recommend hiring and for the Board to adopt that finding.[11]

---

10.   *See supra* note 7.

11.   Alternatively, it would have also been reasonable to view the hiring process as having

two important stages-the threshold determination of whether to offer a trial period and then the ultimate decision of whether to offer

There was substantial evidence on the record as a whole that the Shift Leaders' role in hiring through the temporary agency process involved effectively recommending applicants, through the use of independent judgment not of a routine or clerical nature.

We need not review the NLRB's conclusion that Shift Leaders possess authority to discipline other employees or to effectively recommend discipline. Since we have determined that there was substantial evidence on the record as a whole to support the Board's conclusion that Shift Leaders possess authority to hire or to effectively recommend hiring, the issue of whether Shift Leaders are "supervisors" is settled. Any one of the powers enumerated in 29 U.S.C. § 152(11) suffices to establish an employee as a "supervisor."

However, we do aver that the Board's conclusion that Shift Leaders possessed authority to discipline or to effectively recommend discipline was not supported by substantial evidence. The Board based its conclusion on the fact that "shift leaders exercise their discretion in determining whether to record a late arrival, thereby causing that employee to receive points under the Employer's progressive discipline system." *Id.*" (J.A. at 123.) The main support for the conclusion seems to have been the statement in the Hearing Officer's report that witness Ruth Roggenkamp "related that she has observed occasions when employees have reported late for work without the late arrivals being recorded by the respective Shift Leader." (J.A. at 95.) Roggenkamp's statement as to one incident where lateness was not reported does not support the Board's conclusion. In that one incident, the Shift Leader may have been careless. More-

over, there may be a grace period for lateness, meaning that no "discretion" at all was exercised.

Even if the Shift Leaders exercise discretion in reporting lateness, we have never held that the exercise of independent judgment in a reporting function that has definite disciplinary consequences is tantamount to independent judgment in disciplining or effectively recommending discipline. The employer's point system itself may have precluded even Lytle from exercising independent judgment in many disciplinary situations. Even if Shift Leaders commonly exercised discretion in reporting lateness, we do not think that the fact that lateness has definite disciplinary consequences transforms this discretion into independent judgment in disciplining other employees or in effectively recommending discipline. Reporting lateness appears to be a "clerical function," meaning that it cannot be used to establish "supervisor" status. 29 U.S.C. § 152(11). In *Beverly Enterprises v. N.L.R.B.,* 661 F.2d 1095, 1099–1100 (6th Cir.1981), we stated,

the Regional Director pointed to conflicting testimony regarding the existence of LPN authority: (1) to independently call in extra help, approve overtime, approve absences, and release employees early; (2) to submit effective evaluations of employees which have a bearing on promotions or wage increases; and (3) *to actually discipline employees, or submit effective disciplinary reports which have a bearing on the discipline actually given employees.* Despite the conflicting evidence, the Regional Director concluded that the LPN's exercise of authority in the first category of supervisory activities is purely routine, involving no indepen-

---

a permanent position. It would have been reasonable to further conclude that a vital role in the first stage of the process, involving

non-routine, non-clerical evaluation of the applicant, was sufficient to constitute an effective recommendation.

dent judgment, and that the LPN's participation in the evaluation and disciplinary process, within the second and third categories, is more in the nature of a reporting function, not amounting to effective recommendations of appropriate personnel action.... The Regional Director found that in each instance, the exercise of authority was routine. This finding has warrant or support in the record taken as a whole and will not be disturbed.

(emphasis added). In accordance with this analysis, we believe that regardless of whether some measure of "discretion" is used, the recording of lateness is "a reporting function, not amounting to effective recommendations of appropriate personnel action." *Id.* at 1100. Finally, we observe that the three-member Board panel reached its conclusions largely in reliance on the report of the Hearing Officer,[12] but, as noted above, the Hearing Officer's report never explicitly found that Shift Leaders have the authority to discipline or to effectively recommend discipline.

There does not appear to be adequate support for the Board's conclusion that Shift Leaders exercised authority to discipline or to effectively recommend discipline. But we must concur with the Board's conclusion that Shift Leaders are "supervisors," because there is substantial evidence on the record as a whole that Shift Leaders possess authority to hire or to effectively recommend hiring through temporary agencies. The role of Shift Leaders in hiring involves the use of independent judgment, not of a routine or clerical nature. The authority to effectively recommend hiring is itself sufficient to qualify the Shift Leaders for "supervisor" status.

## CONCLUSION

Procedural issues do not alter the disposition of this case. There is substantial evidence on the record as a whole that Shift Leaders are "supervisors," due to their exercise of independent judgment, not of a routine or clerical nature, in the process of hiring. Accordingly, we ENFORCE the Board's order of September 20, 2001.

---

12. The Board's decision states, "The Board has reviewed the record in light of the exceptions and brief, *has adopted the hearing officer's findings and recommendations,* and finds that a certification of representative should be issued." (J.A. at 122–23) (emphasis added, footnotes omitted).